LITTLE CAESAR ENTERPRISES, INC., Plaintiff,

v.

Gary G. SMITH et al., Defendants.

Gary G. SMITH et al., Plaintiffs,

v.

LITTLE CAESAR ENTERPRISES, INC., et al., Defendants.

Civil Action Nos. 93–40520, 93–40521.

United States District Court,
E.D. Michigan,
Southern Division.

March 31, 1997.

Irwin M. Alterman, Kemp, Klein, Umphrey & Endelman, P.C., Troy, MI, Alan C. Harnisch, Harnisch & Hohauser, Bingham Farms, MI, Stephen D. Susman, Susman Godfrey, L.L.P., Houston, TX, for Little Caesar Enterprises, Inc.

Charles E. Turnbull, O'Reilly, Rancilio, Nitz, Andrews & Turnbull, P.C., Sterling Heights, MI, Shawn M. Perry, Perry, Perry & Perry, Minneapolis, MN, Richard A. Lockridge, Lockridge, Grindal, Nauen & Holstein, P.L.L.P., Minneapolis, MN, for Gary G. Smith.

## ORDER ADOPTING MAGISTRATE JUDGE PEPE'S SEPTEMBER 30, 1996 REPORT AND RECOMMENDATION

GADOLA, District Judge.

This court, pursuant to 28 U.S.C. § 636(b)(1)(B), Fed.R.Civ.P. 72(b), and LR 72.1(d)(2) (ED. Mich. Jan. 1, 1992), has reviewed the September 30, 1996 report and recommendation of Magistrate Judge Seven D. Pepe. That report recommends that this court grant plaintiffs' second motion for class certification and certify the proposed damages and declaratory and injunctive class pursuant to Federal Rule of Civil Procedure 23(b)(3) and allow the Smith plaintiffs to serve as class representatives.

This court has also reviewed the defendants' objections to that report and recommendation and the plaintiffs' response to those objections.

After conducting a *de novo* review, this court accepts the magistrate judge's report and recommendation as the court's findings and conclusions. This court finds those findings and conclusions to be entirely consistent with Federal Rule of Civil Procedure 23(b)(3) and this court's prior opinion and order in *Little Caesar Enterprises, Inc. v. Smith*, 895 F.Supp. 884 (E.D.Mich.1995) wherein this court left open the question whether a national class should be certified based on the franchise agreements signed after mid–1990 which prevented franchisees from requesting an alternate distributor of logoed products. *Id.* at 905.

Therefore, it is hereby **ORDERED** that the magistrate judge's September 30, 1996 report and recommendation is **ADOPTED**.

It is further **ORDERED** that plaintiffs' September 1, 1995 second motion for class certification is **GRANTED**.

**SO ORDERED.**

### REPORT AND RECOMMENDATION ON PLAINTIFFS' SECOND MOTION FOR CLASS CERTIFICATION

PEPE, United States Magistrate Judge.

#### I. Background Facts:

The current motion involves only the antitrust tie-in class in the second of these two consolidated cases. The Smith plaintiffs (hereinafter referred to as "Smiths" or "plaintiffs") are current franchisees of Little Caesar Enterprises ("LCE") who have owned and operated three carry-out-only Little Caesar restaurant franchises in the Jacksonville, Florida, area since 1983. The plaintiffs bring this action seeking damages and declaratory and injunctive relief on behalf of themselves and a proposed class for alleged

antitrust tie-in violations by defendants. From 1989 to date, the relevant class period in dispute, Blue Line Distributing, Inc. ("Blue Line"), a wholly owned subsidiary of Little Caesar Enterprises, Inc. ("LCE"), has sold to LCE franchises virtually all goods necessary to operate their Little Caesar Restaurants.

Little Caesar was founded in Michigan in 1959 by Michael Ilitch, who began to franchise his "Little Caesar" restaurants in 1962. There are presently in excess of 500 franchisees nationwide operating over 3,000 carryout type restaurants. LCE also has a substantial number of company-owned outlets comprising approximately 25 % of the carryout units. Blue Line purchases all of the items used in Little Caesar's restaurants from producers and suppliers and then resells them to LCE franchisees making a single delivery of the multiple goods. Most of these items are produced to meet LCE specifications. These items include foodstuffs, beverage products, sign equipment, paper products, salad dressing, other condiments with LCE's proprietary symbols and marks, and other items. Blue Line initially had only one warehouse in Farmington Hills, Michigan, and thus was limited in the number of midwestern franchisees to whom it could distribute goods. Other distributors were approved by LCE in various regions throughout the country.

In the middle 1980's, Blue Line began to expand the number of its distribution warehouses throughout the country. The Smith plaintiffs allege that LCE and Blue Line replaced other distributors with the newly opened Blue Line distribution warehouses. They allege that by August 1989 defendants had eliminated the majority of third party distributors servicing Little Caesar franchisees and thereafter eliminated virtually all of the remaining distributors in the continental United States except for two remote areas in Idaho that Blue Line did not consider economically feasible to service.

Plaintiffs accuse defendants of unlawfully tying sales of the above-noted goods from Blue Line to the sale and continued operation of the Little Caesar franchises. They allege that the defendants have used Little Caesar's inherent monopoly power derived from its copyrights, trademark, service names, and trade names to impose contractual and other uniform restrictions on the distribution of the various goods to franchisees, thereby eliminating the possibility of renewed competition with Blue Line by other food distributors.

Plaintiffs allege that LCE franchisees who have invested substantial funds in their restaurants and signed long-term franchise agreements were effectively "locked in" to the LCE franchise system. While the franchise agreements provide to each franchisee the right to request that LCE approve an alternate distributor of products made to LCE specifications, plaintiffs accuse defendants of a pattern of wrongfully refusing requests for approval of alternative sources of distribution other than Blue Line. In Judge Gadola's Memorandum Opinion and Order (*Little Caesar Enterprises, Inc. v. Smith*, 895 F.Supp. 884 (E.D.Mich.1995)), he denied class certification of a national class of Little Caesar franchisees who asserted that defendants had been involved in a tie-in arrangement orchestrated by a master plan to deny entry into the marketplace of approved alternate distributors to Blue Line Distributing, Inc. Because the bulk of the franchisees had contracts in which they could seek an alternate distributor of paper products and other goods, the Court found that there was not an express contractual tie-in arrangement. Thus, following a long line of cases that I analyzed in my earlier Report and Recommendation, Judge Gadola determined that individual questions for the various class members would predominate over common questions of law and fact, and, thus, class treatment was not appropriate. He also granted summary judgment on the tie-in claim against the named plaintiffs who had contractual rights to seek an alternate distributer of all items distributed by Blue Line other than proprietary products.[1]

---

1. These included special LCE ingredients such as Pan Pan Dough and special spice mixes. Plaintiffs are not challenging Blue Line's exclusive distribution of these items. These are different

from the "logoed products" involved in this motion. These "logoed products" are not a secret part of the ultimate product being sold and consumed by customers, but cups, boxes, and pack-

LCE in June 1989 entered into a licensing agreement that gave Blue Line the exclusive right to distribute logoed products to franchisees. In Judge Gadola's earlier opinion, he determined that this 1989 licensing agreement applied only to those items that bear the Little Caesar registered mark, such as items on logoed paper products (bags, cups, napkins), packaging, and condiments such as salad dressing which a Little Caesar's franchise provides its customers in the sale of its food products. Defendants assert that well in excess of 90% of the food products and other items sold by Blue Line to a franchisee involve items other than these logoed products. Plaintiffs dispute these figures. Nonetheless, plaintiffs contend that because the profit margin for a distributor on logoed products is greater than other items, other potential distributors cannot effectively compete with Blue Line if they are not given access to these logoed products.

This 1989 exclusive licensing agreement with Blue Line was initially kept secret from the franchisees and only came to light several years later. For franchisees renewing their franchises or entering into new franchises after the middle of 1990, the Franchise Agreement contained restrictive language not permitting them to seek an alternate source of supply of logoed paper supplies and signage.[2]

These logoed products are essential to the operation of a Little Caesar franchise. Plaintiffs are contending that defendants are using this 1989 exclusive Blue Line licensing right on logoed paper, combined with the new 1990 contractual limits on franchisees seeking alternate distributors of logoed products, to preclude alternate sources of supply and competition on these logoed items. Plaintiffs assert that the defendants' denial of access to these logoed products is also intended to make it less profitable or more burdensome for alternate distributors of franchise supplies to enter the market. In sum, plaintiffs argue that the franchisees were squeezed into *buying* logoed items and supplies from Blue Line at super-competitive or above-market prices because of defendants' illegal actions to preclude competition.

In reaching its decision denying class certification and granting partial summary judgment, the Court left open the question as to whether there might be a "basis for certification of a national class action [involving] the franchise agreements signed after mid–1990 [that] prevent franchisees from requesting an alternate distributor of logoed products." *Id.* at 905. The Court noted: "It could be argued that the post mid–1990 agreements, combined with the 1989 exclusive licensing agreement, evidence an express contractual tie-in of logoed products which could receive class treatment." Thus, the Court did not grant summary judgment on the tie-in claim involving the mid–1990 Franchise Agreements.

The Smith plaintiffs thereafter filed this modified motion for a class certification on the surviving tying claims pursuant to Fed. R.Civ.P. 23(b)(3) (for damages) and 23(b)(2) (for injunctive and declaratory). They define the proposed class as:

All franchisees of Little Caesar Enterprises, Inc. ("LCE") who, as of the date of the filing of the Complaint, operated Type C carry-out Little Caesar restaurants in the Continental United States, and who have operated at least one restaurant pursuant to a franchise agreement which was executed, renewed or modified subsequent to mid–1990 to restrict franchisees from requesting alternate suppliers of "signage and other products bearing the Little Caesar name and Proprietary marks." The class excludes defendants, any persons who are not franchisees as of the filing of the Complaint, who are current officers or

aging with the famous Little Caesar figure on them that can be produced to quality and design specifications set by LCE.

2. The amended Franchise Agreement prevented franchisees from seeking alternate suppliers from "signage or other products bearing the Little Caesar name and Proprietary marks." Lockridge Declaration, Exhibit 12, referring to § 7 of the Little Caesar Franchise Agreement of form AC(8/90). While signage is covered by this agreement, it is a one-time purchase of an outdoor sign that requires supplier expertise, and this opinion will use the term "logoed paper products" throughout as dealing with the relevant limitation in these post mid–1990 franchise agreements.

directors of LCE or its subsidiaries, members of their immediate families, any entity in which any excluded person has a controlling interest, the legal representatives, heir, successors or assigns of any such excluded party, and the affiliates and co-conspirators of any defendant.

Plaintiffs' Brief at 1–2.

## II. Class Certification on Plaintiff's Tying Claims.

### A. Background Law:

#### 1. Class Actions:

Fed.R.Civ.P. 23(a) contains four prerequisites that must be satisfied before a lawsuit can proceed as a class action. The Rule provides:

> **(a) Prerequisites to a Class Action.** One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

In addition to the requirements of Rule 23(a), plaintiffs must demonstrate that their case falls within the guidelines of Rule 23(b). That Rule provides:

> **(b) Class Actions Maintainable.** An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or
>
> (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudi-

cation of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

*In re Consumers Power Co. Securities Litigation,* 105 F.R.D. 583, 600 (E.D.Mich.1985).

The only issue before a court on a motion for class certification is "whether plaintiff is asserting a claim, which, assuming its merit, will satisfy the requirements of Rule 23 . . ." *Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130, U.A.,* 657 F.2d 890, 895 (7th Cir.1981), *cert. denied sub nom. Chicago Journeymen Plumbers' Local Union No. 130, U.A. v. Plummer,* 455 U.S. 1017, 102 S.Ct. 1710, 72 L.Ed.2d 134 (1982). In determining whether to certify a class, inquiry into the merits of plaintiffs' claims is inappropriate. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1974); *Weathers v. Peters Realty Corp.,* 499 F.2d 1197, 1201 (6th Cir.1974). A Rule 23 determination is wholly procedural and has nothing to do with whether a plaintiff will ultimately prevail on the substantive merits of its claims. *Blackie v. Barrack,* 524 F.2d 891, 901 (9th Cir.1975), *cert. denied,* 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976). The particular merits of plaintiffs' claims are to be accepted as valid in considering a class certification motion under Rule 23.

Nonetheless, the Court must undertake an analysis of the issues and the nature of required proof at trial to determine whether the matters in dispute and the nature of plaintiffs' proofs are principally *individual* in nature or are susceptible of *common proof* equally applicable to all class members. *See, e.g., Denver v. American Oil Co.,* 53 F.R.D. 620 (D.Colo.1971). Moreover, when a court is in doubt as to whether to certify a class action, it should err in favor of

242

allowing a class. *Eisenberg v. Gagnon*, 766 F.2d 770, 785 (3d Cir.1985), *cert. denied sub nom. Weinstein v. Eisenberg*, 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985); *Horton v. Goose Creek Independent School Dist.*, 690 F.2d 470, 487 (5th Cir.1982), *cert. denied*, 463 U.S. 1207, 103 S.Ct. 3536, 77 L.Ed.2d 1387 (1983); *Esplin v. Hirschi*, 402 F.2d 94, 101 (10th Cir.1968), *cert. denied*, 394 U.S. 928, 89 S.Ct. 1194, 22 L.Ed.2d 459 (1969).

■ It is clear that the Smith plaintiffs satisfy the first two prerequisites of Rule 23(a). Rule 23(a)(1) requires that the class be so large that joinder of all members would be "impracticable." The "impracticability" of Rule 23(a)(1) does not require impossibility, but only difficulty or inconvenience in joining all members of the class. *Jordan v. Global Natural Resources, Inc.*, 102 F.R.D. 45, 51 (S.D.Ohio 1984) ("[s]atisfaction of the numerosity requirement does not require that joinder is impossible, but only that plaintiffs will suffer a strong litigational hardship or inconvenience if joinder is required."); 4 H. Newberg, *Newberg on Class Actions* ("Newberg"), § 18.03 (3d ed. 1992). The numerosity requirement is met when plaintiffs demonstrate that the number of potential class members is large, even if plaintiffs do not know the exact figure. *See Peil v. National Semiconductor Corp.*, 86 F.R.D. 357, 365 (E.D.Pa.1980). Based on an earlier submission by defendants, as of September 30, 1993, there were 244 franchisees that had only the mid–1990 Franchise Agreement and 214 franchisees, like Gary Smith, who had a mixture of old franchises on some outlets and new 1990 franchises on other outlets. Thus, plaintiffs have made the necessary showing to meet the requirement of numerosity.

■ Rule 23(a) also requires that the proposed class members present common questions of law and fact. The resolution of common issues must affect all or most of the class members. *Jenkins v. Raymark Industries, Inc.*, 782 F.2d 468, 469 (5th Cir.1986). This criterion requires only *some* common issues of law or fact, not the *predominance* of common issues required by Rule 23(b)(3). This requirement is satisfied here.

The common questions of law and fact presented on the tying claim include the following issues:

a. Whether LCE has market power in Little Caesar's franchises;

b. Whether defendants imposed an illegal tying arrangement on franchisees by a combination of the 1990 Franchise Agreement and Blue Line exclusive licensing agreement;

c. Whether defendants used their market power over LCE logoed products to exclude competitive distributors of logoed products ("the narrow tie-in");

d. Whether defendants used their market power over LCE logoed products to exclude competitive distributors of all other franchise foodstuffs and supplies ("the expanded tie-in");

e. Whether, as a result of defendants' illegal tying arrangement, defendants charged prices for logoed products higher than the prices that would have prevailed absent the illegal conduct, and thus whether all class plaintiffs suffered the "fact of damages."

f. Whether, as a result of defendants' illegal tying arrangement, defendants charged prices for some or all other franchise foodstuffs and supplies higher than the prices that would have prevailed absent the illegal conduct.

g. Whether defendants' anticompetitive conduct affected interstate commerce, and if so, to what degree.

■ The *typicality* requirement of Rule 23(a) is somewhat more difficult, but I believe it is also fulfilled. "Typicality exists when the class representative presents issues common to the class, and the representative's position on those issues is not antagonistic to the position of the other class members." *Consumers Power Co.*, 105 F.R.D. at 602. Under this requirement, the interests of the class representative should be generally coextensive with those of the class members he or she seeks to represent. The typicality requirement is met if the plaintiff's claim "arises from the same event or practice or course of conduct that gives rise to the claims of the other class members, and her

or his claims are based on the same legal theory." *Newberg*, § 18.08. Typicality may exist where there is a very strong similarity of legal theories, even if substantial factual distinctions exist between the named and unnamed class members. *Appleyard v. Wallace*, 754 F.2d 955, 958 (11th Cir.1985).

 In the present case, the Smith plaintiffs base their claim on a nationwide course of conduct by defendants which affected all class members. The class representatives' claims arise from precisely the same events, legal documents, and consequences and legal theories affecting all franchisees—the illegal tying scheme imposed by defendants on the franchisees.

Defendants argue that because Gary Smith in the spring of 1992 wrote for the specifications for paper supplies and asserted his position that he could seek an alternate supplier of logoed goods under his mid–1990 Franchise Agreement, this should bar his being a typical class representative and also show this was an individual and not a common issue of fact. In an April 7, 1992, response, LCE's Director of Quality Assurance stated:

> Please note that no specifications have been included for logoed items, such as pizza bags, as these items may only be purchased from Blue Line Distributing, Inc.

Smith again wrote for the Approved Supplier List for all items, including paper goods. In response to this second request, David Deal wrote on May 7, 1992, quoting the restriction in the mid–1990 Franchise Agreement to "help clarify your 'understanding' of my franchise agreement." (The quotation marks around "understanding" could be interpreted by a jury to indicate an incredulity about Smith's asserted belief as to what the Franchise Agreement clearly said.)

> Please be advised that Blue Line is the sole approved supplier of paper products containing the Little Caesar name or proprietary marks. It is my understanding that under the Franchise Agreement you do not have the right to request that any other suppliers be approved for those products.

Alterman Declaration. Exh. 4.

Smith wrote back on May 15, 1992, that the Franchise clause allowing a franchisee to purchase goods "including paper goods as approved by LITTLE CAESAR" from any source approved by LCE gave him the right. He asserted that if Blue Line were "the sole distributor of paper products," was there a "monopoly and perhaps illegal tying arrangement?" Smith repeated his earlier request that AmeriServ be approved as a distributor.

Defendants argue that if the tie-in claim is based on the mid–1990 Franchise Agreement forcing a state of mind in franchisees that they could not seek an alternate distributor other than Blue Line for logoed goods, Smith's letter shows he did not have that state of mind, at least until after Deal's May 7, response. Thus, they claim Smith is not typical.

Defendants also contend that the contract must be ambiguous and thus requires extrinsic evidentiary input on the intent of the parties (obviously a question that could require individual and not common proofs). I do not find any ambiguity or incompatibility between the contract clauses. The mid–1990 Franchise Agreement makes it clear that the franchisee can purchase logoed goods from an alternate source if one is approved other than Blue Line. If no other distributor of logoed goods is approved, however, the franchisee cannot ask that an alternate distributor of these goods be approved. Mr. Deal's response is a correct interpretation of the unambiguous contract he had drafted and a clear articulation of Blue Line's position. Whether Mr. Smith really believed his assertions or these were merely tactical assertions made in the hope they would get Blue Line to relent or clearly articulate its position so Smith could accuse Blue Line of antitrust violations, which he did in his next letter, does not seem a critical issue.

The critical question is what the Franchise Agreement says and what a reasonable franchisee would understand it to mean. If defendants have demonstrated Gary Smith is unreasonable, maybe he is not typical. Whether Gary Smith really believed or

feigned belief that he could demand what his Franchise Agreement clearly and expressly precluded him from demanding is not the centerpiece of the antitrust question this Court must resolve. Deal's response made clear that Gary Smith, like all post–mid–1990 franchisees, was in a market with a single approved supplier of logoed products (Blue Line), and that the Franchise Agreement and the defendants were not going to allow such franchisees to request an alternate supplier of logoed products. Smith is one of these franchisees and knew of the constraints on him at least after May 7, 1992.

I believe Gary Smith's claim is typical for purposes of Rule 26(a)(3). The other issue is whether Gary Smith, who owned franchises with both pre and post–mid–1990 Franchise Agreements should represent purported class members who only have post–mid–1990 Franchise Agreements. It is possible the Court could grant summary judgment against these "hybrid" franchise holders who have both pre and post–mid–1990 Franchise Agreements. This could eliminate Gary Smith's tie-in claim on the mid–1990 Franchise Agreement and leave those with only mid–1990 Franchise Agreements without a representative.

While I do not believe it to be essential at this time, and do not recommend it, if the Court determines Gary Smith is not typical or does not adequately represent franchisees with solely post–mid–1990 Franchise Agreements, the Court could give plaintiffs a fixed and limited time to come forward with a substitute class representative and, if one is not produced, refuse to certify the class. In other words, the Court may condition the class certification upon plaintiffs' production of an adequate representative within a fixed period of time.[3]

■ The fourth and final requirement of Rule 23(a) is that the named plaintiff must fairly and adequately represent the interests of the class. This requirement has two prongs: the first concerns the zeal and competence of the named plaintiffs' legal representation, the second concerns conflicts of interest between the named plaintiffs and the class. In this case, defendants have not challenged that plaintiffs are represented by competent counsel who have experience in this type of litigation. Gary Smith has also demonstrated a strong and indeed tenacious interest in taking an active role in the litigation and in vigorously protecting the interests of the entire class. He has repeatedly come from Florida to Michigan for important motion hearings even when it was clear his presence was not needed. Few could argue that Gary Smith is the leader of this crusade to end Blue Line's near-monopoly on distribution to Little Caesar franchises. As discussed above, the interests of the Smith plaintiffs generally are not in conflict with those of the class on the tying claim. Their interests in establishing the illegal nature of the defendants' conduct coincide with those of the proposed class.

The most difficult issue in this motion, as with the prior class certification motion, is whether, under Fed.R.Civ.P. 23(b)(3), the plaintiffs' *common* issues of fact predominate over *individual* issues of fact. Additional background on the law of tying and its case

---

3. This Court is given broad discretion in dealing with class actions under Fed.R.Civ.P. 23. Rule 23(c)(1) states that "[A class certification] order under this subdivision may be conditional, and may be altered or amended before the decision on the merits." *Carpenter v. Stephen F. Austin State University*, 706 F.2d 608, *rehg. denied*, 712 F.2d 1416 (5th Cir.1983), allowed substitution of adequate class representatives for representatives found to be inadequate during the course of the class claims. Affording plaintiffs the opportunity to provide such substitutes is the common practice in cases where, although the current named representatives are inadequate, adequate representatives are known and available as substitutes. *Davis v. Thornburgh*, 903 F.2d 212, 233 (3rd Cir.) (Becker, CJ, concurring in part and dissenting in part), *cert. denied*, 498 U.S. 970, 111 S.Ct. 436, 112 L.Ed.2d 420 (1990); *see also, Hanzly v. Blue Cross of Western New York*, Unpub. op. No. CIV–86–35E, 1989 WL 39427 (W.D.N.Y.1989) (copy attached). [Editor's Note: Copy deleted for publication purposes.] Thus, this Court could permit a substitute class representative if it becomes necessary. Because any substitute class representative was covered in the earlier motion for class certification and by this motion, the statute of limitations has been tolled for substantial periods during this litigation and will continue to be tolled if this proposed class is certified. Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, 7B Federal Practice & Procedure: Civil 2d at §§ 1791, 1794.

law development under Rule 23(b)(3) is necessary to analyze plaintiffs' proposed methods of proving both the alleged illegal tying and the impact of that tying on the class members (*i.e.* the "fact of damages" as a consequence of the alleged wrong).

### 2. Illegal Tying:

*Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 461, 112 S.Ct. 2072, 2079, 119 L.Ed.2d 265 (1992), elaborated on the elements of a prima facie tying case:

A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Northern Pacific R. Co. v. United States*, 356 U.S. 1, 5–6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Such an arrangement violates § 1 of the Sherman Act if the seller has "appreciable economic power" in the tying product market and if the arrangement affects a substantial volume of commerce in the tied market. *Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. 495, 503, 89 S.Ct. 1252, 1258, 22 L.Ed.2d 495 (1969).

*See also, Bell v. Cherokee Aviation Corp.*, 660 F.2d 1123, 1127 (6th Cir.1981) (citing *Fortner Enterprises v. U.S. Steel Corp.*, 394 U.S. 495, 499, 89 S.Ct. 1252, 1256–57, 22 L.Ed.2d 495 (1969), ("*Fortner I*") and *Northern Pac. Ry. Co., supra*, at 6, 78 S.Ct. at 518).

### 3. Damages—the Fact of Damages v. Individual Damages:

In addition to proving the illegal tying arrangement, plaintiffs must also prove the impact of such a violation. It must be shown that the illegal tie caused harm to consumers of product B in the tied market and that this affected a substantial volume of commerce.

The impact or the *fact of damages* is separate from proving the actual measure of damages for each class member. Liability and damages phases of litigation are generally bifurcated, and a class action on liability should not be avoided merely because the specific damage claims will need to be handled in individual trials.[4]

The class plaintiffs need only show that all suffered some loss in their business, and that there was a causal relation between the tying arrangement and that loss. *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 454 (3d Cir.1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). The court noted particularly that there was no requirement that the loss be personal or unique to a plaintiff, and that the *fact of damages* was different than a measure of *individual damages* for each specific plaintiff in the class. The *fact of damages* could be

made on a common basis so long as the common proof adequately demonstrates some damage to each individual. Whether or not fact of damage can be proven on a common basis therefore depends upon the circumstances of each case.

561 F.2d at 454. It noted on the facts of that case:

If the price structure in the industry is such that nationwide the conspiratorially affected prices at the wholesale level fluctuated within a range which, though different in different regions, was higher in all regions than the range which would have existed in all regions under competitive conditions, it would be clear that all members of the class suffered some damage, notwithstanding that there would be variations among all dealers as to the extent of their damage.

Under such circumstances, proof on a common basis would be appropriate. 561 F.2d at 455. Nor is the fact that there will be uncer-

---

4. *Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, 7B Federal Practice and Procedure: Civil 2d at § 1781*, notes:

In this connection it uniformly has been held that differences among the members as to the amount of damages incurred does not mean that a class action would be inappropriate.

Rather, the question of damages can be severed from that of liability and tried on an individual basis. Allowing split proceedings furthers the Rule 23 purpose of promoting judicial economy....

tainty later in the individual measure of damages fatal to common proof of the fact of damages so long as it can be clearly shown that the illegal behavior of defendants did cause some damage in fact to each class member.[5]

Defendants argue that the damages or fact of damage issue is too complicated for class treatment, and that *Bogosian* and other cases are flawed in their reasoning. I find no precedent in this circuit that accepts this argument. The gestalt of much of defendants' argument is an attempt to make this case appear overwhelmingly complicated and thereby remove the class action tool from plaintiffs' hands. Simple express tie-ins do not come to federal courts today because they are too easily detected. Without prejudging the merits of this case, if plaintiffs are correct on their claims, then the complexity of the tie-in scheme and its long-undetected duration—which is the result of its covert, complex and subtle dimension—are the causes of any complexity on liability or on the actual measure of damages. If it is ultimately proven that defendants violated the Sherman Act, it seems unfair and ironic that the party who caused the complexity on liability and damages should benefit from such acts by disarming the plaintiffs and the Court of the most efficient and effective tool for resolving the issues. I believe defendants' complexity arguments are exaggerated, should not intimidate or overwhelm this Court, and should not prevail.

### 4. Is Coercion an Element of a Tying Claim, and Is It Amenable to Common Proofs?

In the present case, there exist several questions regarding the extent to which coercion of the franchisees must be proven. Plaintiffs assert that proof of coercion is not a separate and essential element of a tie-in prima facie case. Defendants contend that it is either a separate element or a necessary part of the proof on the issue whether two products are actually tied when there is not an explicit tie-in in the franchise contract. Because there is no clear and express tie-in of the LCE franchise with the foodstuffs and supplies, or even with the logoed products in this case, defendants argue that coercion must be proven, and such proofs must be made on an individual basis, i.e., there must be evidence that each franchisee felt that it was forced to buy the "tied products" from Blue Line in order to maintain its Little Caesar franchise (the "tying product"). Defendants· note that part of plaintiffs' claim that the Blue Line exclusive license over logoed products precluded purchase of other foodstuffs and products from an alternate supplier is based on the asserted preference of franchisees for "one-stop" shopping and their aversion to having multiple suppliers delivering different products to the outlet at different times. Defendants contend that such preference for one-stop shopping varies among the franchisees and would necessitate individual proofs. Even though plaintiffs assert that they will use common proofs on such preference by calling only a limited number of representative franchisees to testify to this preference, defendants assert that they can call in rebuttal a parade of individual franchisees who are willing to take more than one delivery from various distributors each week. Plaintiffs argue that if coercion must be separately proven to show a tie-in, it is amenable to common or class-wide proofs, and thus common proofs "predominate" over individual proofs and Rule 23(b)(3) is satisfied.

#### a. The Third Circuit Analysis:

Because the Sixth Circuit case law on coercion as a separate element of tying and on when it is amenable to common proofs is incomplete, it is worth analyzing these two issues and their effect upon class certification as they developed in the Third Circuit,· which has undertaken the most thorough and helpful analysis of these issues. In addition, the recent (1996) analysis by Professors Areeda, Hovenkamp and Elhauge in their treatise

---

**5.** *See, e.g., Story Parchment v. Paterson Parchment Paper Co.,* 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931):

The rule which precludes recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount. *Id.* at 92–92 n. 8.

provides helpful insights and warnings of common judicial missteps and confusions.[6]

The Eastern District of Pennsylvania, in *Ungar v. Dunkin' Donuts of America, Inc.,* 68 F.R.D. 65 (E.D.Pa.1975), *rev'd,* 531 F.2d 1211 (3d Cir.), *cert. denied,* 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976), held that coercion was not a separate element of proof necessary to establish an illegal tie-in. *Ungar* involved Dunkin' Donuts' alleged tie-in of real estate, equipment, signs, and supplies to a Dunkin' Donuts franchise. Dunkin' Donuts offered what was called a "turnkey" franchise in which it bought or rented real estate, completely outfitted a Dunkin' Donuts retail outlet, and then provided it to a "franchisee" who merely had to "turn the key" in order to be in business. The district court noted that several of these franchisees could not afford to acquire their own real estate, build their own shop, or buy equipment independently, and many of them never considered dealing with anybody but Dunkin' Donuts. Several franchisees acknowledged that they were "persuaded" by the defendant's sales persons, and not coerced to deal with the defendant on the tied products.

For periods after 1970, Dunkin' Donuts did not have an express contract provision requiring the franchisees to buy equipment and other items. Yet, the plaintiffs accused Dunkin' Donuts of having a "de facto policy of tying." They also accused Dunkin' Donuts of only approving other suppliers if those suppliers gave a kick-back to Dunkin' Donuts, which required the franchisees to pay a higher price to acquire products from these "approved" suppliers than would have existed in a free market. Because the district court found that coercion was not a necessary element, it found that the individual franchisees would not have to testify about their being coerced into buying the tied items. Thus, the district court concluded that the case could proceed as a class action under Fed. R.Civ.P. 23(b)(3) because common proofs of a company's pervasive policy of illegal tying would predominate over individual issues.

The Third Circuit reversed the district court. In highlighting the central harm to the marketplace that was involved in tying, the court concluded that "[i]t is only when the buyer's freedom to choose a given product is restricted that the tying doctrine comes into play." 531 F.2d at 1226.

[C]oercion is implicit—both logically and linguistically—in the concept of leverage upon which the illegality of tying is premised:

531 F.2d at 1218. The Court continued:

we simply cannot accept the district court's view that the Supreme Court has not set forth a coercion requirement in tying cases.

*Id.* at 1219. It then acknowledged that:

Saying that coercion is an element of a tying claim is, of course, not the same thing as saying that it must be established on an individual basis, but we think that the two statements are logically related. What is sufficient to coerce one buyer's choice may not be sufficient to coerce another buyer's choice; an item that one buyer might accept voluntarily, another might accept only if forced to do so. The expressions "coercion" and "individual coercion", in our view, reflect different perspectives on the same phenomenon. In the context of substantive tying law, "coercion" is the relevant term. But in the context of a class action, the question is whether "individual coercion" must be established by each plaintiff.

531 F.2d at 1219.

In the *Ungar* case, for the relevant periods after 1970 there was not an express contractual tying arrangement that specifically removed from the franchisees the freedom to acquire the "tied products" from another source. On those facts, the Court found that individual coercion had to be proven. Thus, common questions of fact did not predominate and class certification was inappropriate under Fed.R.Civ.P. 23(b). The Third Circuit left open the question whether individual coercion needed to be shown when there was an express contractual provision. 531 F.2d at 1226 n. 17.

---

**6.** Areeda, Hovenkamp, and Elhauge, *Antitrust Law,* Vol. X, *An Analysis of Antitrust Principles* *and Their Application,* (Little, Brown & Co. 1996).

After outlining the three elements from *Eastman Kodak* noted above as making out a prima facie tie-in claim, the court considered the first element of whether there was "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product." *Id.* 531 F.2d at 1224 (citing *Northern Pacific Ry. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958)). It notes:

> Obviously, with respect to the first element, a formal agreement is not necessary, although it is sufficient. But, in the absence of a formal agreement, a plaintiff must establish in some other way that a tie-in was involved and not merely the sale of two products by a single seller. This can be done by proof that purchase of one product, the tied product, was not voluntary, *i.e.*, by proof of coercion.

531 F.2d at 1224 (footnote omitted). It noted that while a number of franchisees might have agreed to accept burdensome or uneconomic terms in purchasing the tied product, this alone was not sufficient to prove the coercion element of an illegal tie-in, although the Court acknowledged that such facts were some evidence of coercion. *Id.* at 1225. In making its analysis, the Third Circuit looked to the policy behind the *per se* bar on tie-ins:

> The purpose of the antitrust laws is to stimulate economic competition, the essence of which is the presence of many competing sellers; salesmanship—the art of persuasion and influence—is inherent in competition among sellers. It is only when the buyer's freedom to choose a given product is restricted that the tying doctrine comes into play: so long as "the buyer is free to take either product by itself there is no tying problem." *Northern Pacific Ry. v. United States, supra,* 356 U.S. at 6 n. 4, 78 S.Ct. at 519 n. 4.

531 F.2d at 1226. The Court concluded that on the facts before it:

> Where, as here, plaintiff franchisees place no reliance on express contractual tie-ins, each, individually, must prove that his purchases were coerced as an element of establishing a prima facie case of illegal tying.

*Id. Ungar* made a critical distinction that the doctrine of coercion was implicit in the existence of a tie-in, and that, at least in the absence of an express contractual tie, coercion on an individual basis (or "individual coercion") was required to be shown to demonstrate that an illegal tie existed.

Following *Ungar,* the Eastern District of Pennsylvania faced another case in which various oil companies were accused by their franchise gas station distributors of conditioning the leasing or subleasing of a gas station site on their purchase of gasoline supplied by the oil company-lessor. *Bogosian v. Gulf Oil Corp.*, 62 F.R.D. 124 (E.D.Pa.1973), *vacated and remanded,* 561 F.2d 434 (3d Cir.1977), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). In *Bogosian,* no single lease provision required the lessee to purchase all its gasoline from the lessor. Yet, the lease provisions were for terms of only six to twelve month, the lessee had to purchase a license to use the lessor's trademark, and, as a condition of that, the lessee was required not to sell other gas from pumps bearing that oil company's trademark. In addition, the lessee could make no alteration to the leasehold (such as putting in an additional gas storage tank and pump) without the lessor's approval. Finally, the lease could be terminated whenever the lessee failed to purchase the stated quantity of gasoline from the lessor. The defendant lessor oil companies asserted that this did not prevent the lessees from installing their own pumps and tanks to sell a different brand of gas. The plaintiffs asserted that this requirement was uneconomical on a six to twelve month lease, particularly because such alterations of the leasehold premises would be grounds for termination and further that the station operator would be unable to meet the minimum contract purchase quota of the lessor's gasoline if they sold a competing brand.

The district court initially held that because no single lease provision expressly required the purchase of gasoline from the defendants, there were thus disparate legal and factual claims and it would be necessary to make "a factual determination in each and every lease that there was such economic coercion in fact as to constitute an illegal tie-

in agreement." *Id.* 62 F.R.D. at 137. Citing some of the same cases on coercion that the defendants cited in this case on the first class certification motions, the district court found that a class action was inappropriate because common questions did not predominate over individual issues of fact. *Id.* at 135–36.

The Third Circuit disagreed with the district court, stating:

> Relying upon *Ungar,* defendants appear to argue that coercion is a requirement of proof in all tying cases. Neither *Ungar* nor any other case has so held. Rather, *Ungar* affirmed that under a long line of Supreme Court precedents a tying claim consists solely of the three elements quoted above. Assuming economic power over the tying product and a not insubstantial amount of commerce, the plaintiff need only show that a seller conditioned the sale of one product (the tying product) on the purchase of another product (the tied product).

561 F.2d at 449.

\* \* \* \* \* \*

> We therefore conclude that once a plaintiff proves that a defendant has conditioned the sale of one product upon the purchase of another there is no requirement that he prove that his purchase was coerced by the seller's requirement.

561 F.2d at 450.

\* \* \* \* \* \*

> We cannot agree with the district court that proof of coercion is necessary to the existence of a tie-in on the theory under which the lease claim is brought. Plaintiffs do not contend that defendants pressured them into refraining from selling competing brands, but that the lease contracts themselves precluded them from doing so. Defendants acknowledge that the only way a lessee could sell other brands under the lease agreements would be to install his own pumps and tanks. Whether such a course is realistically open to a short term lessee is a common question of fact which can be developed by expert testimony concerning the relative costs and benefits of making such installations. Similarly, a lease provision which permits termination of the lease when a stated quantity of gasoline is not purchased from the lessor hardly leaves the lessee open to reject some or all of the lessor's gas in favor of that of a competitor. If plaintiffs are able to show that the lease agreements in use by all defendants have similar clauses which have the practical economic effect of precluding the sale of other than the lessor's gasoline, they will have shown that the purchase of gasoline was tied in to the lease of the service station. Under these circumstances the lease agreement itself conditions the sale of one product (here a lease) upon purchase of another, and as we indicated in part III B 1 a, *supra,* proof of coercion is not a required element of the plaintiff's case.[n. 11 omitted] Thus, this case differs from *Ungar* in which plaintiff's proof of the existence of a tie-in focused not on the terms of the agreement but on proof of salesmanship accompanied by threats of termination.[12]

------

[12] It follows from the foregoing discussion that if class certification is granted, plaintiffs will be precluded from introducing evidence of threats of termination to prove the existence of a tie-in. *Ungar, supra.* Similarly, plaintiffs could not prove that they were precluded from installing tanks and pumps by the clause requiring the lessor's approval of leasehold alterations if proofs that such approval would be withheld depended on specific instances of the clause being exercised in that manner.

561 F.2d at 452.

Thus, the Third Circuit in *Bogosian* held that coercion was not a separate element, but may be a necessary element of proof implicit in proving that there was an actual tie of one product to the sale of another. In the absence of an express contractual written tie, or in the absence of similar contract clauses which, when considered with other common proofs extrinsic to the contract,[7] have the

------

7. While it could be argued that demonstration of coercion by proofs extrinsic to the contract should preclude class treatment under Rule 23(b)(3), it is clear that in *Bogosian,* proof of the practical economic effects would indeed require such extrinsic proofs, probably by an economic expert, as to the practical market effects and limitations a gas station operator faced in light of the various contract terms.

practical economic effect of precluding the purchase of the tied product from a competing third party source, plaintiffs may be required to resort to proof of coercion based on specific instances involving each individual plaintiff.[8] Yet, where there is an express contractual tying arrangement, or where the practical economic effects flowing from the contract clauses and other common proofs establish a tie, individual proof of coercion is not necessary, and common proof of the tie-in can be made.[9] It is worth noting that the Third Circuit ruled that if plaintiffs wish to establish a tie by common proofs, they should be precluded from introducing individual evidence of specific threats or specific instances of defendants' refusal to grant approval that would be necessary for an individual plaintiff to buy from a third party source. The Third Circuit in *Bogosian* vacated the district court order that denied class certification and remanded for reconsideration in light of its opinion. *Id.* at 457.

The wrong that the *per se* prohibition on tying seeks to remedy is the removal of the buyer's free choice in the tied market. In establishing a prima facie case, the plaintiff need not prove that other competing products in the tied market are superior to defendant's or that the plaintiff would have chosen a competitor's product. *Bogosian* makes it clear that it is not a legitimate defense for the defendant to prove the plaintiff would have bought defendant's tied product even if there had been no tie. 561 F.2d at 449. While the quality and relative price of defendant's product may be relevant to the *fact of damages* and its individual measurement, tying is a *per se* antitrust violation because it deprives the buyer of free choice in a market of competitors. Such restraint of free market forces is presumed to have an effect on

market quality and more commonly on market price of the defendant's product. As the Third Circuit noted in *Bogosian:*

It has never been an element of plaintiff's case to disprove, nor even a permitted defense, that the tied product is superior to others available on the market, or that even without the tie requirement plaintiff would have purchased the tied product.

\* \* \* \* \* \*

The purpose of the rule against tying is to insure that a buyer's choice is counseled solely by his perception of the merits of the tied product, so that the seller with economic power over the tying product does not gain an artificial advantage over competitors engaged in sales of the tied product. The antisocial conduct which the rule seeks to deter is the act *of the seller conditioning* sale of one product upon purchase of another. One can hardly imagine anything which would vitiate that purpose more than a requirement that a violation depends upon proof that the buyer bringing suit would not have purchased the tied product but for the tie requirement. The issue is whether the seller acted in a certain way, not what the buyer's state of mind would have been absent the seller's action.

561 F.2d at 448–49.

Following the 1977 remand by the Third Circuit, and before the 1984 remand consideration by the Eastern District of Pennsylvania, the Supreme Court decided *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). *Jefferson Parish* set out a two-step analysis in tying cases: "whether petitioners are selling two separate products that may be tied to-

---

8. *Bogosian* noted that several cases involving coercion in a tie-in setting dealt with a pattern of making a request or suggestion that the buyer acquire the tied product from the seller "coupled with pressure, intimidation, in short . . . coercion." 561 F.2d at 451. It is clear, in a case in which the tie is to be established by a request or a suggestion followed by pressure, intimidation, or traditional types of coercion, that individual proofs would generally predominate and a class action would be inappropriate.

9. Other courts have explained why coercion is implied where a contract explicitly requires the tie because a contract "is backed by the force of law." *Halverson v. Convenient Food Mart, Inc.,* 69 F.R.D. 331, 335 (N.D.Ill.1974); *McCoy v. Convenient Food Mart, Inc.,* 69 F.R.D. 337, 340 (N.D.Ill.1975). Coercion remains a necessary element of an unlawful tying arrangement but it is inferred on a class-wide basis; a contractual provision is coercive in and of itself because it is backed by the force of law. *See also, 7–Eleven Franchise Antitrust Litigation,* 1972 WL 618, 1972 Trade Cases ¶ 74,156 (N.D.Cal.1972).

gether, and, if so, whether they have used their market power to force their patients to accept the tying arrangement." *Id.* at 18, 104 S.Ct. at 1561. The Court made several statements indicating that there is a coercion requirement. The Court noted:

> [W]e have condemned tying arrangements when the seller has some special ability—usually called "market power"—to force a purchaser to do something that he would not do in a competitive market. [Citations omitted] When "forcing" occurs, our cases have found the tying arrangement to be unlawful.

466 U.S. at 13–14, 104 S.Ct. at 1558–59. In a footnote, the Court noted:

> This type of market power has sometimes been referred to as "leverage." ... " 'Leverage' is loosely defined here as a supplier's power to induce his customer for one product to buy a second product from him that would not otherwise be purchased solely on the merit of that second product." 5 P. Areeda & D. Turner, Antitrust Law ¶ 1134a, p. 202 (1980).

466 U.S. at 14 n. 20, 104 S.Ct. at 1559 n. 20.

The Court later noted:

> *Per se* condemnation—condemnation without inquiry into actual market conditions—is only appropriate if the existence of forcing is probable.

466 U.S. at 15, 104 S.Ct. at 1560. "[O]nly if patients are forced to purchase [the tied product] as a result of the hospital's market power would the arrangement have anticompetitive consequences." *Id.* at 25, 104 S.Ct. at 1565. Like the Third Circuit in *Bogosian,* the Supreme Court in *Jefferson Parish* looked to the underlying policies of the Sherman Act.

> Basic to the faith that a free economy best promotes the public weal is that goods must stand the cold test of competition; that the public, acting through the market's impersonal judgment, shall allocate the Nation's resources and thus direct the course its economic development will take.... By conditioning his sale of one commodity on the purchase of another, a seller coerces the abdication of buyers' independent judgment as to the "tied" product's merits and insulates it from the competitive stresses of the open market.

466 U.S. at 12–13, 104 S.Ct. at 1558 (quoting *Times–Picayune Publishing Co. v. United States,* 345 U.S. 594, 605, 73 S.Ct. 872, 879, 97 L.Ed. 1277 (1953)).

While the Third Circuit in *Bogosian* focused on the action of the seller that precluded the buyer's choice, not the buyer's actual state of mind, 561 F.2d at 450,[10] *Jefferson Parish* used a perspective that focused more upon the effects on the consumer in the marketplace.[11] Yet, neither this case nor other subsequent cases have specifically made coercion an independent element of proof in the tying case, although this was an issue considered by the Eastern District of Pennsylvania after *Jefferson Parish* in the 1984 *Bogosian* remand determination.

#### b. Sixth Circuit Case Law on Coercion:

The Sixth Circuit in *Bell v. Cherokee Aviation Corp.,* 660 F.2d 1123 (6th Cir.1981), appears to have limited the coercion element in the same manner as the Third Circuit in *Bogosian.* In *Bell,* defendant Cherokee had leased airport space to Executive with an express contract provision requiring Executive to purchase all aircraft fuel and nonemergency maintenance service from Cherokee. The defendant argued that it was the plaintiff's corporation (Executive) that proposed the express written tie-in, and thus

---

10. As noted above, the Third Circuit state in *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434 (3d Cir.1977), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978), that the rule against ties "seeks to deter the *act of the seller conditioning* sale of one product on the purchase of another." 561 F.2d at 450 (emphasis in original). "The issue is whether the seller acted in a certain way, not what the buyer's state of mind would have been absent the seller's action." *Id.*

11. Defendants here argue that this requires an inquiry into whether Little Caesar franchisees felt coercion to buy from Blue Line. Yet, for reasons stated below, the actual and anticompetitive effects in the marketplace can occur without proof that the individual franchisees knew of them or of the reasons for them.

there was no coercion. The Sixth Circuit cited *Bogosian* and rejected this defense. The court stated that "[w]e do not think that coercion is an element of an illegal tying arrangement," but later added that "[w]here the tie-in is clear on the face of the contract ... there is no need to inquire into coercion." *Id.* at 1131. The Sixth Circuit noted further that:

> Coercion might be relevant in determining whether a seller in fact conditioned the purchase of one product on the purchase of another.

*Id.* This is consistent with the Third Circuit's position in *Bogosian* that, while not a separate element of the prima facie case, proof of coercion may be necessary to prove the first element of a tying claim—that the sale of one product is in fact conditioned on the purchase of another—in the absence of an express contractual tie.

Dictum in *Virtual Maintenance, Inc. v. Prime Computer, Inc.*, 11 F.3d 660 (6th Cir. 1993), indicates that coercion is still relevant in tying cases where there is not an express tie-in. An " 'essential characteristic' of an illegal tying arrangement [is] the seller's ability to coerce customers into buying an unwanted tied product." *Virtual Maintenance*, 11 F.3d at 665 (quoting *A.I. Root Co. v. Computer/Dynamics, Inc.*, 806 F.2d 673 (6th Cir.1986)).

It is also significant that, like the Third Circuit, the Sixth Circuit rejected the defense theory "that even without the tie-in requirement plaintiff would have purchased the tied product." [12] *Bogosian*, 561 F.2d at 449. *See also Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 721–25 (7th Cir.1979), *cert. denied,* 445 U.S. 917, 100 S.Ct. 1278, 63 L.Ed.2d 601 (1980), cited by the *Bell* court for this proposition that the illegality of a tie-in is its wrongful restraint in the marketplace of the buyer's freedom "to take either product by itself," *Northern Pacific R. Co., supra,* 356 U.S. at 6, n. 4, 78 S.Ct. at 519 n. 4, or not at all. Unlike a fraud case, in which a defendant has available the defense that the plaintiff would have bought the item notwithstanding the misrepresentation or material

omission (*i.e.* "lack of reliance"), the same is not true in a *per se* tie-in antitrust case. The antitrust laws are concerned with harm to the marketplace caused by unreasonable restraints on competition. As noted in *Fortner I, supra:*

> [T]here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.

> \* \* \* \* \* \*

> Where [tying] conditions are successfully exacted competition on the merits with respect to the tied product is inevitably curbed. Indeed "tying agreements serve hardly any purpose beyond the suppression of competition." ... They deny competitors free access to the market for the tied product, not because the party imposing the tying requirements has a better product or a lower price but because of his power or leverage in another market. At the same time buyers are forced to forego their free choice between competing products. For these reasons "tying agreements fare harshly under the laws forbidding restraints of trade." ... They are unreasonable in and of themselves....

394 U.S. at 498, 89 S.Ct. at 1255(1969) (quoting *Northern Pac., supra,* 356 U.S. at 5–6, 78 S.Ct. at 518, footnote and citations omitted.) *Jefferson Parish* adds that "application of the *per se* rule focuses on the probability of anticompetitive consequences."

> The rationale for *per se* rules in part is to avoid a burdensome inquiry into actual market conditions in situations where the likelihood of anticompetitive conduct is so great as to render unjustified the costs of determining whether the particular case at bar involves anticompetitive conduct.

466 U.S. at 15–16 and n. 25, 104 S.Ct. at 1559–60 n. 25 (citation omitted).

---

12. If the issue of whether defendants would have purchased from Blue Line at higher costs (even if

they had a choice) was relevant, then individual proofs of each franchisee would predominate.

### c. Other Cases Allowing Common Proofs of a Coercive Tie–In:

Other cases without express contractual ties have allowed class certification where common proofs of coercion or forcing demonstrate a tie-in. One case involved a "firm policy" of the defendant having a "uniform effect" of tie-in and where statements of an agent of defendant to 99% of prospective franchisees and consistent form letters showed a tie-in.[13]

Another case involved common proofs of an unremitting policy of tie-in accompanied by sufficient market power in the tying product to restrain competition in the tied product.[14] Other courts have found that where sufficient economic power exists in the tying market, an appreciable number of buyers accepting burdensome or uneconomic terms in the tied market can be either sufficient[15] or at least some[16] common proof of a tie-in.

An admission by a defendant that a subsidiary of the franchisor was the prime lessor on all stores has been taken to indicate that common proofs of a tie exist.[17] *Newberg on Class Action* notes:

Evidence of an unremitting policy of tie-in and sufficient market power may also be proffered to show classwide coercion. Allegations alone of such a policy may be insufficient, however, and the plaintiff should bolster such charges with evidence such as classwide adherence to the tie-in policy.

*Id.* at § 18.30 (footnotes omitted).

### d. The Antitrust Treatise of Professors Areeda, Hovenkamp and Elhauge:

Excerpts from Professors Areeda, Hovenkamp and Elhauge's treatise bring together the themes in the case law, clarify common errors, and focus on the policy behind prohibition on tie-ins to project how courts should address certain issues where there is not a clearly expressed tie-in, and where part of the actions or thinking of the seller is hidden from the buyer.

A tying condition occurs when its "practical effect" is to foreclose, even partially, rival suppliers of the allegedly tied product.

*Id.* at ¶ 1752, p. 279 (references to subsection in the book omitted).

**13.** *Martino v. McDonald's System, Inc.*, 81 F.R.D. 81 (N.D.Ill.1979) (prior to the express tie-in in 1964, from 1961–1964 McDonald's had a uniform policy of tying a lease from a subsidiary of the defendant to McDonald's franchisees.)

**14.** *Hill v. A–T–O, Inc.*, 535 F.2d 1349, 1354 (2d Cir.1976) (The sale of a vacuum cleaner was tied to the sale of membership in a buying club. The sale of these items was done by door-to-door salespersons, and it was undisputed that the only way one could buy a membership in the buying club was to also purchase a compact vacuum cleaner.)

**15.** In *Image Technical Services v. Eastman Kodak Co.*, 1994 WL 508735 (N.D.Calif.1994), Kodak was selling replacement parts for its copiers only to buyers who agreed not to buy service for the machines from independent service organizations. In certifying a class action, the district court addressed the 23(b)(3) issue of predominance by noting that plaintiffs sought to prove coercion under Ninth Circuit case law that permits coercion to be implied from proof that "an appreciable number of buyers have accepted burdensome terms, such as a tie-in, and there exists sufficient economic power in tying market." *Moore v. Jas. H. Matthews and Co.*, 550 F.2d 1207, 1217 (9th Cir.1977). *See also, Krehl v.*

*Baskin–Robbins Ice Cream Co.*, 78 F.R.D. 108, 118–19 (C.D.Cal.1978).

**16.** While the Ninth Circuit accepts such proofs as adequate proofs of coercion, the Third Circuit in *Ungar v. Dunkin' Donuts*, 531 F.2d 1211, 1225 (3d Cir.1976), discussed in detail above, held that such proofs constitute "some evidence of coercion," but could not "accept the proposition that such proof, alone, would suffice to establish, prima facie the coercion element of an illegal tie-in claim."

**17.** *Krehl v. Baskin–Robbins Ice Cream Co.*, 78 F.R.D. 108, 118–19 (C.D.Cal.1978). The defendant had admitted to the Federal Trade Commission that its subsidiary was the prime lessor on all of its stores, and that all stores were fully equipped and ready for operation when turned over to a franchisee. *Id.* at 118. The court noted that in the absence of such an admission of the universal acceptance of the lease and initial equipment package, the court would not certify a class. *Id.* at 119. While the court found that the *coercion* element in its case was amenable to common proof on the tie between the franchise and the lease and equipment package, these claims were not certified for class treatment because common proofs did not exist on the *fact of damage* with respect to these alleged ties.

To decide that issue [of whether two products have been tied together], the courts have often asked whether the plaintiff's purchase of the defendant's bundle was "coerced" and "forced" or in fact "voluntary." But these terms must be understood merely as shorthand for a more nuanced inquiry into whether the defendant has so acted as to constrain buyer choices *illegitimately.*

*Id.* at 280.

If the tied customers might have purchased elsewhere, an impact on the defendant's "competitors" should be found even if there are no competitors because of the tie.

*Id.* at 282 (footnote omitted).

... a tying "agreement" or "condition" is present when the defendant has taken advantage of customers' desire for his product *A* to constrain *improperly* their choice between his product *B* and that of his rivals (footnote 16 omitted). Given the constraints created by the defendant, customers choose his *B* "voluntarily." At the same time, the improper constraint "coerces" or "forces" those choices.[17] Unfortunately, both verbs are often used loosely by litigants and judges.

[17] See ¶ 1754b (collecting cases showing that coercion merely express the need for proving a tying condition).

Courts usually say that two products are not tied unless buyers are "coerced" or "forced" to take them together (footnote omitted). They are certainly correct that more must be shown than buying two products from the defendant, and "coercion" or "forcing" is often a useful shorthand for the necessary showing.

\* \* \* \* \* \*

Furthermore, "coercion" often raises abstract, extraneous, and metaphysical questions about whether the buyer acted "willingly" or "voluntarily." After all, every package purchase is voluntary in that buyers preferred it to the other available options (such as buying elsewhere or doing without) and in that its price did not exceed its value to them. It is involuntary in that others have constrained or structured the options. The legal question then is whether the defendant constrained or structured those options illegitimately and by what standard.... "[t]he only thing that can be said with absolute certainty on the subject [of coercion] is that the concept has proved elusive." ... The buyer's volition does not distinguish what should be condemned nor what should be allowed.

In sum, the language of "coercion," "forcing," and "voluntariness" should be understood as inviting a specific factual inquiry about whether the defendant has illegitimately constrained buyer choices and precise articulation of the standards for determining legitimacy.

*Id.* at 283–86 (some citations and footnotes omitted).

In the present case, defendants frequently note facts that seem curious and inconsistent with antitrust claims that involve "coercion," "forcing," and "conditioning" claims. For example, there are many contented franchisees who freely choose to buy paper products and other supplies from Blue Line. Why did so few other franchisees other than Gary Smith seek an alternate supplier to Blue Line? Indeed, even many franchisees who own outlets with both the old and new franchise agreements have not used their right under the old contracts to seek an alternate supplier of logoed products which, if honored, would provide an alternate source of logoed goods for all the franchisees in the area.

Areeda, Hovenkamp and Elhauge note that an illegal tie-in constraint on buyers' choices can occur even if there are no competitors or if the buyers would not have purchased from a competitor. "The buyer's volition does not distinguish what should be condemned nor what should be allowed."

Where there is a tying arrangement, it is not made legal by the fact that the "buyers would have purchased the defendant's product without regard to the tie, [or buyers] do not consider the contract onerous or suffer rigorous enforcement ..." *Id.* at 292. The relevant question is whether the seller "has illegitimately constrained buyer choices." The authors note that:

*Jefferson Parish* said, "tying arrangements need only be condemned if they restrain competition on the merits by forcing purchases that would not otherwise be made."

*Id.* at 295 (citing *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 27, 104 S.Ct. 1551, 1566, 80 L.Ed.2d 2 (1984)). Yet, the authors clarify:

> But the Supreme Court did not invite inquiries into what buyers would otherwise have done, for the Court made plain that sufficient "forcing" exists when buyers "might have preferred" to buy the tied product elsewhere. Tying "occurs when the buyer must accept the tied item and forego *possibly* desirable substitutes."

*Id.* at 295, citing *Moore v. Jas. H. Matthews,* 550 F.2d 1207, 1217 (9th Cir.1977) (emphasis added).

> The policy rationale is simple. "[E]ven if some of the [buyers] would have selected [the defendant's tied product] regardless of the tying arrangement, the arrangement prevented them from making that choice freely."

*Id.* at 295, citing *Tic–X–Press v. Omni Promotions Co.,* 815 F.2d 1407, 1417 (11th Cir. 1987).

While this treatise was revised well after *Jefferson Parish* (1984) and its focus on the buyer, these antitrust scholars still quote *Bogosian's* conclusion that:

> The issue is whether the seller acted in a certain way, not what the buyer's state of mind would have been absent the seller's action.[19]

[19] *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 449–450 (3d Cir.1977), cert. denied, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978); *Anderson Foreign Motors v. New England Toyota Distributor,* 475 F.Supp. 973, 988 (D.Mass.1979) (tying test focuses not on buyer's state of mind but on seller's actions).

Speculation about what buyers would have done had the defendant allowed them to exercise independent judgment is often unreliable and involves the very sort of burdensome inquiry into actual market conditions the per se rule was meant to avoid.... Moreover, the very existence of the tie prevents buyers from changing their minds and discourages rivals, including new entrants, from tying to woo them from the defendant.[20]

[20] *Associated Press v. Taft-Ingalls Corp.,* 340 F.2d 753, 757, note 5, at 761 (key evil of tying is that "it forces the buyer to give up his independent judgment").

There is little reason to undertake that burden when the defendant himself doubted the outcome sufficiently to impose the restraint and when there is a better test. The best way to test whether buyers would otherwise have taken the defendant's tied product would be to offer the tying and tied products separately.[21] If the best the defendant can say about an otherwise unlawful tie is that it has no effect, there is little reason to tolerate it.[22]

[21] *See, e.g., Photovest [Corp. v. Fotomat Corp.,* 606 F.2d 704 (7th Cir.1979), cert. denied, 445 U.S. 917, 100 S.Ct. 1278, 63 L.Ed.2d 601 (1980) ], note 6, at 711.

[22] While the existence of a tying restraint does not depend on what buyers would otherwise have done, there would be no foreclosure (¶ 1724c) and perhaps no separate products (¶¶ 1743a, 1748) absent a reasonable *possibility* that buyers would purchase the tied product elsewhere. It is enough that buyers might have wanted to purchase the tied product elsewhere in the absence of the defendant's tying conditions....

*Id.* at 295–96.

The authors note that the Supreme Court has

> wisely refused to require rigorous enforcement of a tying contract. Both *International Salt* and *Northern Pacific* held products tied together even though the contractual obligation to buy the tied product was often unenforced, waived, or leniently administered (footnote omitted). The reason is that the "overhanging threat of enforcement is ever present" to influence buyer choices.

*Id.* at 297.

In situations involving seller approval of alternate suppliers, Areeda, Hovenkamp, and Elhauge state:

> When the number or size of disinterested suppliers the defendant is willing to approve is too small to provide buyers with workably competitive choices, the products should be deemed tied together.

*Id.* at 300. The authors suggest as a rule of thumb that the buyers of the defendant's product *A* should have a 50 percent supply of product *B* from alternate available sources in order not to constitute a tie.

The present case does not involve a clear, express tie in a single contract as was involved in the Sixth Circuit's *Bell v. Cherokee Aviation Corp.* case. Rather, in a market where there are no current alternate suppliers of logoed items and no current alternate suppliers of other foodstuffs and supplies, the post–mid–1990 franchisees were contractually limited from seeking an alternate supplier of logoed goods. Plaintiffs assert that this new 1990 express contractual limitation was drafted with defendants' intention that it work in tandem with the covert 1989 licensing agreement that gave Blue Line the exclusive right to have logoed products produced and the exclusive right to distribute logoed products either to franchisees or to third-party distributors approved by LCE. These facts involve what Areeda, Hovenkamp and Elhauge call an "understood condition."

**1754c. Understood condition.** The situation is exactly the same when a defendant makes no formal announcement but so acts as to lead reasonable buyers to understand that they cannot get product *A* unless they also take his product *B*. There is then a tying condition promulgated by the defendant's own conduct, which clogs competition by denying rivals free access to buyers. We stress two requirements for an understood tying condition.

First buyers must actually and reasonably believe that such a condition exists, for otherwise there is no understood condition. As a practical matter, however, there is no need to inquire into subjective belief once the tribunal is persuaded that the circumstances generate a reasonable belief that a tying condition exists, for subjective beliefs can be inferred from objective circumstances.[13] And, any subjective belief must still be objectively reasonable. . . .

or proof that buyers frequently violated the condition without loss.

*Id.* at 303–304.

*Second,* buyers' reasonable belief that they must buy defendant's B in order to get his A must be the result of the defendant's own conduct that could reasonably be expected to bring that belief about.[15]

Otherwise, a defendant would be unfairly punished though *he* has not created a reasonably understood tying condition. . . .

Once we have an absolute and unqualified understood condition, the consequences are the same as an announced condition. But the announced condition is more likely to be clear, while the plaintiff may have difficulty persuading the tribunal that an understood condition exists. . . .

In these ambiguous situations ... the tribunal may have difficulty judging what constitutes a sufficient and *illegitimate* constraint on buyer choices. Such judgments depend on substantive antitrust policy, which does not differ between the Sherman and Clayton Acts.

*Id.* at 305 (footnote omitted).

The authors then create a series of presumptions from circumstantial facts. They note, first of all, that even with an announced condition,

The defendant might have relented if asked. Nonetheless, the defendant is engaged in tying, at least presumptively. The announcement is intended to constrain buyer choice and, absent contrary evidence, creates the reasonable impression among buyers that their ability to purchase product *A* is conditioned on their purchases of product *B*.[21] This is enough.

---

[13] Even so, the defendant should be allowed to rebut such an inference with credible proof that buyers did not actually believe this threat—such as direct statements from them of disbelief

[15] See ibid.; *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 460 (3d Cir.1977), cert. denied, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978) ("The issue is whether the seller acted in a certain way, not what the buyer's state of mind would have been absent the seller's action."); *Anderson,* note 5, at 988 (tying test focuses not on buyer's state of mind but on the seller's conduct in conditioning).

[21] The announcement also implies that the defendant intended to implement a tying condition even if uncommunicated to buyers. See ¶ 1755.

*Id.* at 305–306 (emphasis in the original). In such situations, Areeda, Hovenkamp, and Elhauge do not feel that the plaintiff needs to affirmatively prove that requests by other buyers to buy *A* separately were rebuffed by the defendant, nor must they show the onerous nature of the bundling of the two products which buyers would not otherwise have accepted but for the tie, nor what the buyers understood with respect to the announced condition, nor the percentage of bundled sales versus separate sales, nor the termination of customers or franchisees who buy *B* from rivals. The authors note:

> After all, when the defendant feels the need to announce the condition, he must have thought it would have some effect.

*Id.* at 306.

In the absence of an express contract, or a clearly announced condition, some other proof of "coercion" is required. Yet this coercion means only that there is a conditioning or other illicit market manipulation of the sale of one item on that of another, and not that the purchase otherwise would not have been made but for the tie. Again, according to these authors, "foreclosure resulting from 'coercion,' not coercion alone, is the gravamen of the tying offense." *Id.* at 298. These commentators observe that the question of whether the customer would have purchased the tied product absent the tie is irrelevant in cases involving announced or understood conditions as well those involving unambiguous tying contracts. *Id.* at 307. Yet, the authors note that certain courts have confused this concept by the use of the term "coercion."

> Unfortunately, some erroneous dicta have required proof of "coercion"—apparently in the sense of a purchase that would not otherwise have been made—even though an announced or understood condition has been established.[31]

---

[31] If the plaintiff is a purchaser, however, he would not be able to obtain damages for purchase of a tied product that he would have taken in the same amount and at the same price absent the tie. With respect to such purchases he has suffered no injury-in-fact.

*Id.* at 307.

These courts recognize that no such proof is needed for express tying contracts and distinguish the nonexpress case as requiring coercion (typically in the sense of a proved announced or understood condition), but then appear beguiled by their coercion language to require proof that coercion caused buyers to take a product they would not otherwise have taken.[32]

---

[32] *See Tic–X–Press*, note 10, at 1415–1416; [*Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 669 n. 5 (7th Cir.1985)] *Unijax v. Champion Intl*, 683 F.2d 678 (2nd Cir.1982)., (quoting *Ungar v. Dunkin' Donuts*, 531 F.2d 1211, 1218 n. 8 (3d Cir.), cert. denied, 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976)); *Response of Carolina v. Leasco Response*, 537 F.2d 1307, 1327 n. 8 (5th Cir.1976) (quoting *Ungar*); [*Capital Temporaries v. Olsten Corp.*, 506 F.2d 658, 662–663 (2d Cir.1974)].

This is mostly dicta, either because the existence of an announced or understood condition was either unclear or not at issue. These cases should be understood merely to require the necessary condition and some proof that without that condition the buyers *might* have wanted another product.[33]

---

[33] *See* ¶ 1753c; *Smith [v. Mobil Oil Corp.]*, note 8 [667 F.Supp. 1314], at 1331–1332 & n. 15 (class action need not be dismissed though some members of class desired defendant's tied product; tying condition evidenced by form contract).

Otherwise, courts would be burdened with assessing proof the buyers were caused or coerced to take tied products they did not want even when it is undisputed that there was an announced or understood condition that product *B* had to be bought to get product *A*. *That unnecessary burden is especially great when courts refuse to certify class actions because they require proof of individual coercion, which varies among customers, beyond an announced or understood tying condition.*[35]

---

[35] *Ungar*, note 8; *Waldo [v. North American Van Lines*, 669 F.Supp. 722, 727–728 n. 8 (W.D.Pa.1987)]. *See also Olmstead v. Amoco Oil Co.*, 1977 WL 1416, 1977–1 Trade Cas. ¶ 61,-487 (M.D.Fla.) (refusing to certify a class of gasoline dealers forced by their dealership contracts to operate car wash facilities as well; dealers who wished to have the car wash and would have taken it anyway suffered no injury and thus could not be included in a class seeking damages). And *see Service & Training v. Data*

*General Corp.*, 963 F.2d 680, 685 (4th Cir.1992) (stating in tying class action that absent evidence of an "express tying agreement" the plaintiff must present "evidence that affirmatively 'tends to exclude the possibility' that [the defendant] and [his customers] 'were acting independently' in the sales and purchases of products" (quoting *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984))).

*Id.* at 307–308 (emphasis supplied).

The authors provide courts guidance on the types of proofs that may be sufficient to prove a tie-in when the tie is not expressed clearly in a contract or in an announcement by defendant. In considering whether a silent plan or covert intention of the seller to tie the products together can constitute a tie, the authors conclude that it should not because the basic test of tying "is whether the defendant seller has illegitimately constrained buyers' choices in buying product *B* from the defendant rather than from his competitors." *Id.* at 313. A defendant using solely a silent decision to tie has done nothing to induce anyone to purchase his second product because the buyers do not know of the silent condition. If they did, it would then have become an understood condition. It is in this sense that the "buyer's state of mind" (*see Jefferson Parish*, 466 U.S. at 12, 104 S.Ct. at 1558, and Judge Gadola's opinion in this case, 895 F.Supp. at 905), is important. Did defendants' actions create sufficient non-covert effects in the marketplace of which the buyer was aware that they helped induce his choice of seller's product *B*? If so, then not *all* of the seller's actions or intentions need be publicly known.

The critical first question is what sorts of proofs are necessary to constitute a prima facie case of an "understood tie in," particularly if certain facts are not known to plaintiffs until after the suit is filed, as in this case. The second question is whether such proofs are available in this case, and, if so, are they predominately common to all class plaintiffs or predominately individual.

Areeda, Hovenkamp and Elhauge have a complete section on Proving Understood Conditions that makes out an impermissible tie-in.

The authors considered various presumptions which they believe should prevail in the absence of contrary evidence. They start with an easy case. When the defendants make products *A* and *B* available separately, a tying condition is presumptively absent even when buyers request or choose a bundle of products. The conclusion is not undermined even when there is "a high percentage of bundled sales, onerous terms for the tied product, or a single contract covering both products, although these factors might help resolve more ambiguous cases...."

They also conclude that: "A form contract covering two products is presumptively a tie even though the buyers have not requested separate provision and been rebuffed." *Ibid.* The authors noted that in ambiguous cases, other relevant proofs include a high percentage of defendant's transactions are bundled or the terms for defendant's products are onerous. A high proportion, or even 100 percent, of bundled sales does not itself indicate that the two products have been tied together. The buyers may prefer to acquire the products together. Yet, "a high percentage of bundled sales can usefully supplement other evidence to indicate an understood tying condition." *Id.* at 317.

In another example where the defendant employs a "form contract" covering two products, this initially indicates an understood tying condition but the seller can offer evidence to rebut this inference. In such a case, a high percentage of bundled sales would then be surrebuttal evidence by plaintiff. In the form contract example, the authors acknowledge that 80 percent taking the bundled items *A* and *B* might indicate that a vast majority of customers reasonably assumed they had no choice. Admitting that any market percentage line is arbitrary, they would require

> 90 percent bundling to make persuasive otherwise insufficient evidence of a tying condition or more than 10 percent unbundling to rebut an otherwise established or presumed inference of a tying condition.

*Id.* at 318 (footnote omitted).

Regarding onerous conditions, the authors state that: "A tie is not conclusively established by evidence that taking product *B* is onerous because its price is higher or its

quality lower than market alternatives." *Id.* at 318. Price-quality claims are difficult to resolve, and buyer testimony of lower quality is self-serving. An objectively higher price might be offset by higher quality. Nonetheless, the authors note:

> [W]e can presume that a rational customer would not take an overpriced or inferior product *B* unless he must in order to get the defendant's product *A*—that is, unless there was a tying condition.[20]

---

[20] *Data General Corp. v. Grumman Systems Support Corp.*, 36 F.3d 1147, 1181 (1st Cir.1994)(contract provided some but insufficient prima facie evidence of a tie; tying condition might be inferred if alleged tied product " 'inferior or overpriced' "); *Detroit City Dairy v. Kowalski Sausage Co.*, 393 F.Supp. 453, 464–466 (E.D.Mich.1975)(relying in part on high price for defendant's tied product coupled with evidence of direct threats from the defendant's employees).

> To be sure, the typical buyer burdened with an above-market quality-adjusted price for product *B* is compensated in the form of a lower price than he would otherwise have paid for product *A*. Nevertheless, a customer might prefer to buy product *B* elsewhere notwithstanding recompense when buying it from the defendant.

*Id.* at 318–19 (n.21 omitted). This leads the authors to conclude that if the buyer purchased product *B* from the defendant, it tends to suggest that the buyer did so in order to get product *A*.

Indeed, where the defendant's opening position involves both products, rebuffed efforts to buy product *A* separately or proof that such a request would be futile could indicate an illegal tie-in. Here, the authors note the relevance of evidence that might have been kept secret from the buyer until discovery in litigation.

> For convenience in administering the antitrust laws, moreover, we would infer futility from defendant's internal documents or admissions known to the tribunal—though

not to customers—that defendant would not sell *A* separately.

*Id.* at 325.

In the present case, Little Caesar and Blue Line did not specifically announce a tie-in. But, plaintiffs assert that they specifically did announce that franchisees could not request an alternate supplier of logoed products, and the surrounding circumstances, which circumstances were contributed to by the defendants, made an alternate choice of suppliers of logoed products impossible. Thus, franchisees with a mid–1990 franchise agreement who chose to continue purchasing product *A* (continuing as a Little Caesar franchisee) knew they were required to continue buying paper products from Blue Line and could not seek an alternate supplier of such goods.

In the present case, plaintiffs' tie-in case rests on the assertion that because of the surreptitious 1989 exclusive licensing agreement with respect to paper products, the defendants had precluded any alternate suppliers and, through the express contractual provision in the existing market conditions, induced the franchisees not to seek an alternate supplier.[18]

### III. Plaintiffs' Suggested Mode of Proof:

Plaintiffs assert that they intend as their primary proofs to use documents obtained from the defendants in discovery and expert opinions of economists and others, that will constitute common proof of a national effort by the defendants to use their market power, particularly their exclusive right to have manufactured and to distribute logoed products essential to a franchise operation, to create a situation where Blue Line was not only the sole distributor of logoed paper products but maintained its position as the near exclusive distributor of all supplies necessary to operate a franchise.

Considering certain of the factors that Areeda, Hovenkamp and Elhauge found relevant in ambiguous cases of the understood condition tie-in, in the present case, in all relevant respects Blue Line is virtually the

---

18. An issue that has not been briefed or argued and awaits further judicial resolution is whether the subclass of "hybrid" franchisees, who also had an old franchise agreement without the restrictive language and were permitted to seek alternate suppliers of paper products but failed to do so, have a tie-in claim?

exclusive distributor of logoed paper goods and other foodstuffs and supplies for a franchise.

Second, the proofs will show that a form franchise contract was used after mid-1990 with respect to all of the proposed class members. This contract expressly prohibits the franchisees from requesting an alternate supplier of logoed paper products in a market in which Blue Line was at the time the sole distributor of such products. While this was not an express form contract tying product $A$ and $B$ together, the relevant inquiry for an "understood condition" tie-in is its practical economic effect in a market where these franchisees had only Blue Line as a distributor of product $B$.

While the Little Caesar/Blue Line exclusive license agreement was not known to the parties at the time, its consequences were apparent in the marketplace at least to the extent that no other entities had produced or attempted to distribute logoed paper products to Little Caesar franchisees. Also, because Blue Line was a wholly owned subsidiary of Little Caesar, the exclusive licensing agreement in effect meant little more than Little Caesar Enterprises was refusing to allow production or distribution of logoed paper products without its consent. While the facts show that LCE did relent in the two recent applications for alternate distributors that were approved during the pendency of this lawsuit, there is evidence that, during the earlier relevant time periods, Little Caesar withdrew the rights to distribute logoed paper products from at least one of the prior competing distributors, PYA Monarch, and other documents made available to plaintiffs through discovery show that this was known to be a strategic business tactic that made it more difficult for competing distributors to compete with Blue Line and satisfy the franchise preferences for one-stop shopping.

Plaintiffs also assert that the contracts entered into by the franchisees resulted in the charging of supra-competitive prices, thus being the "onerous contract" evidence referred to by Areeda, Hovenkamp and Elhauge. While defendants can point to the fact that recent applications for alternate distributorships that were pending during

this lawsuit have been approved, and even note that these distributors have not yet entered the marketplace to provide goods and services, plaintiffs will show that during the relevant time at least one other applicant for distribution services, AmeriServ, was denied the right to be a distributor. Plaintiffs will also show through expert and other testimony that because the mark-up on logoed paper goods is higher than that of other items, defendants' tactic of denying access to logoed paper goods to alternate distributors made it more difficult for competitors to enter the market and match or beat Blue Line's pricing.

While the Court's ruling on a motion for class certification is not to consider the merits of the case or even the sufficiency of the evidence as would be done in a motion for summary judgment, it is worth reviewing some of the proffered evidence to determine if it is common to the class in order to help make a judgment whether the common evidence predominates over the evidence that need be individual.

In referring to the deposition of LCE's President, David Deal, he acknowledged that the reason the franchise agreement was modified in 1990 was "[b]ecause we wanted to conform the Franchise Agreement to the business intent we had to control distribution of our trademarked items." Plaintiffs' Exh. 14, Deal Dep. at 186.

A September 22, 1988, memorandum from Deal to Ilitch dealing with Blue Line's expansion into the southeast United States where it would compete with the existing distributor, PYA Monarch, Deal noted that the approach used in the past of merely disapproving the competitive distributor would not work because PYA had been doing a credible job in the southeast at the time. It appears another competitor, Sysco, would be disapproved. In dealing with the franchisees, the tone of the announcement was to state an expectation that the franchisees would swing over to Blue Line or "in the PYA area, we are going to fight them (albeit with a stacked deck)," apparently referring to the exclusive access to logoed products that Blue Line would have. Plaintiffs' Exh. 8 at p. 1.

In a November 12, 1991, memo from David Deal to David Kushner, he notes:

The original intent of the agreement was to provide an exclusive arrangement for Blue Line to distribute paper products and other supplies to Little Caesar restaurants so that Little Caesar would be able to exclude third parties from these offerings. It was not contemplated at that time to put in place an even broader agreement to involve products that do not ultimately find their way to the customer, such as uniforms, signage, etc.

Plaintiff's Exh. 21. At his deposition, when asked to explain what he meant when he said he was going to fight PYA Monarch "albeit with a stacked deck," Deal admitted: "That we were going to leverage every business advantage we had seen." *Id.* at 400. He later noted that the competitive strategy intended "Pushing our business advantages within the limit of the law." *Id.* at 404. He noted that one of those advantages was the fact that Blue Line had exclusive access to logoed items.

In a memo of April 20, 1992, in dealing with how to compete with AmeriServ when it was about to enter the southeast as an alternate distributor to Blue Line, Deal again wrote Ilitch outlining a number of tactical considerations. Again, apparently the anticipation was that AmeriServ would not be given access to logoed paper products, so that franchisees who purchased from AmeriServ would also have to purchase at least some items (*i.e.* logoed products) from Blue Line. Deal's memo concluded,

The result of these elements will be to put us in the best competitive position and also require the stores to take two deliveries per week—one from us and one from AmeriServ. I am hopeful, that, over time, they will see that this inconvenience is not giving them any significant benefit. This was a fairly significant factor in our ability to wear down those stores that initially wanted to continue with PYA Monarch several years ago.

Plaintiffs' Exh. 11 at p. 1. Deal's deposition also acknowledged that restricting PYA Monarch's ability to get logoed and proprietary items was an intentional effort to force the franchisees in the southeast to take two deliveries, one from Blue Line and one from PYA Monarch. *Id.* at 404.

In Deal's deposition, while denying that the defendants had a master plan to control distribution of goods to franchisees, he acknowledged: "Certainly we wanted as much of the business as we could obtain through being competitive and leveraging everything we could to our advantage that was legal ..." Plaintiff's Exh. 14, Deal Dep. at 378. In listing the specific business advantages that he had vis-a-vis competing distributors, among other advantages Deal noted that "we had access to our trademarked and proprietary items." *Id.* at 389.[19]

Plaintiffs also refer to a July 5, 1991, letter from Matt Ilitch, Vice–President for Distribution at Blue Line, to Kathy Campbell of Leprino Foods, who was earlier the distributor before Blue Line moved into its distribution area of Northern California and Nevada. He noted that Leprino Foods was being displaced by Blue Line not because of any failures of Leprino "as our associate distributor. Rather it is part of the Little Caesar master plan to control distribution of Little Caesar brand products through its Blue Line distribution division." Lockridge Exh. 7.

In a January 17, 1989, memo from Deal to Ilitch, he again refers to the strategy for moving into the southeast through their At-

**19.** Obviously an ultimate issue for the Court is whether defendants' strategy to limit access to the logoed products was a legal or an illegal business practice. For purposes of this motion for class certification, this Court must assume that plaintiffs' legal theory on this is correct, unless this Court wishes to invite and resolve motions for summary judgment of the issue prior to determining whether to certify a class. Compare *Siegel v. Chicken Delight, Inc.,* 448 F.2d 43 (9th Cir.1971), *cert. denied,* 405 U.S. 955, 92 S.Ct. 1173, 31 L.Ed.2d 232 (1972), where it was held impermissible for the franchisor to control distribution of items needed for operation of a franchise when the criteria for those items could be set by specifications, with *Krehl v. Baskin–Robbins Ice Cream Co.,* 78 F.R.D. 108 (1978), in which the court held that the franchisor could control distribution of the product when it was the ultimate product being consumed by the customer. In the present case, the logoed items are sold to the customer, but, unlike *Baskin–Robbins,* these are not the products actually consumed by the customer.

lanta warehouse to compete with PYA Monarch by denying them access to "our super-proprietary items of square dough mix, spice mix and logoed packaging."

This approach, which will require those franchisees to place twice weekly food orders in the event they choose not to give us all their business, is bound to generate some degree of resentment among certain franchisees. Over time, however, I believe that they will not begrudge us our right to totally control distribution of our proprietary items and this move will put us in the best possible competitive situation.

Lockridge Exh. 9.

Plaintiffs contend it is precisely this conscious effort to leverage the sale of one product on the other that the tie-in antitrust laws were intended to prevent.

Plaintiffs' expert economists Stephen Siwek and Dr. Philip Nelson note that an anticompetitive tie-in can be accomplished through a series of actions and contracts rather than a single contract. They distinguish between "single systems distributors" that provide food services for a limited menu restaurant such as a Little Caesar franchise outlet, with a "broadline distributor" that services multiple restaurants or other food sale outlets. The economists indicate that most sales through such distributors are on a cost-plus basis, and thus the ability to buy in greater volume at lower costs or to cut transportation costs provides a substantial competitive advantage. The experts note that most systems distributors handle more than one restaurant chain, which allows them to bundle distribution deliveries to various stores run by different chains and thereby lower the unit cost of delivery. They also stress that such multi-chain systems have substantial buying power by buying supplies to service different chains, allowing them to negotiate good prices.[20] They add, for exam-

ple, that AmeriServ's sales were larger in total volume than Blue Line's. They argue that they could show impact or damages based on an analysis of a typical "market basket" full of goods necessary to operate a franchise. Based on an analysis of the varying costs, they assert that the defendants through their asserted tie-in have forced each of the franchisees to pay higher prices for Blue Line's distribution services than they would have been paying had they been able to use or to credibly solicit the services of a competing distributors. Lockridge Exh. 1 at ¶ 41. They note that this injury to class members can be proven based on overall prices charged for a market basket regularly purchased by a Little Caesar franchise. They explain further how the damages affected all of the franchisees, whether or not they would have switched to a competitive distributor, because the price competition would force Blue Line to lower its prices if they faced competition from an alternate distributor. This would benefit even the customers who stayed with Blue Line.

William Burgess of AmeriServ, in his Declaration of August 3, 1994, noted that:

Without the ability to distribute logoed products as part of the full-line distribution program, it is not economically possible to compete [with Blue Line] because the food items are traditionally sold on very low margins and to achieve an economic blended profit margin, it is necessary to be able to also sell the higher profit paper and packaging.

Lockridge Exh., Burgess Declaration at ¶ 17.[21] He noted that they quoted Little Caesar a blended profit of 8 to 8-1/2 percent for full line distribution services. *Id.* at ¶ 19. He added that AmeriServ provided food services or at least delivery of food to multiple chains, and these delivery services were highly computerized allowing delivery two or

---

20. In a June 19, 1989, letter from David Deal when he was Senior Vice-President at Blue Line to Fred Dietrick at Food Services Enterprises, Inc., in Rocky River, Ohio, Deal noted that they had compared Blue Line's cost with that of a competitive distributor, Gordon's. He noted that Blue Line was producing a comparable cost result. With regard to "lower volume food items on the list," Deal acknowledged "we are pur-

chasing much lower volumes than our competition and I would expect [these items] to be somewhat higher" (Bates # 00064).

21. In a January 21, 1993, memo from AmeriServ, it was noted that "[w]ithout the logo products, it will be very difficult to make a successful program." Plaintiffs' Exh. 19.

more times a week, but one time a week was most economical. *Id.* at ¶ 26. He stated that

the major cost to a distributor is the cost of delivering the goods by truck ... [and] independent distributors that served multiple locations like AmeriServ and its competitors, that distributor has the capability to deliver the same goods at a lower cost than a distributor which is serving only one chain. Most national chain restaurants tend to be clustered in very close proximity to each other. As a result, AmeriServ can deliver, for example, to a Wendy's, Applebees, KFB, Burger King all of which may be situated at the same intersection or within blocks of each other.

*Id.* at ¶ 28. In contrast, he noted that Blue Line serves only Little Caesar outlets, which tend to be spread out geographically. He also claimed that for other chains they serviced, AmeriServ was allowed to distribute logoed goods, including paper and packaging. "We purchase direct from the manufacturers in those instances." *Id.* at ¶ 30. Finally, he asserted that AmeriServ had "greater purchasing power than Blue Line has, since the independent distributors purchase products for more than one chain." *Id.* at ¶ 33. He concluded that:

I am aware of the locations of Blue Line warehouses and know that there are specialty distributors and/or broadline distributors capable of serving Little Caesar restaurants anywhere in the Continental United States.

*Id.* at ¶ 34.

Plaintiffs have produced a document they argue suggests that defendants have admitted that facing a competitor would result in a lowering of Blue Line's profit margins and prices, not only in the competitive market, but nationwide. In the April 20, 1992, Deal to Ilitch memorandum dealing with the defendants' planned response to AmeriServ's efforts to enter the market in the southeastern United States, in addition to the planned efforts to limit their access to logoed prod-

ucts to force two deliveries, Deal also stated that:

We must move to modestly reduce our margins on items we will be competing on. At this time, it is difficult to really know how good our pricing is. However, I do think it is high enough that we can be undercut [hand written] "and AmeriServ still operate profitably." A percent or two we could quickly respond to, but if they get really aggressive we run the risk of losing the credibility we have worked so hard to regain. To minimize the risk of this, I think we need to gradually move our margins down over the next two to three months, particularly in the Southeast. Pricing would be adjusted on the high visibility items such as cheese, meats, boards and flour. Phasing this in over several months will reduce its visibility. I am suggesting price reductions which would lower our margin by 1.0 to 1.25 percentage points out of the Atlanta, Orlando and Greensboro, with reductions of about one-half that amount in other centers. This will probably not be enough to face down a competitive onslaught, but will reduce the attractiveness of our business and keep us within the credibility range.

Lockridge Exh. 11.

In a supplemental declaration of October 16, 1995, from plaintiffs' experts Stephen Siwek and Philip Nelson, they assert:

The defendants in their brief have made a fundamental error by confusing the *computation* of damages with the antitrust *impact* requirement which only requires a showing of some anticompetitive effect on all class members.

Siwek and Nelson supplemental declaration of October 16, 1995.[22] This supplemental declaration points to ¶ 44 of their earlier declaration, which reads as follows:

Because members of the class had the contractual right to use qualified distributors other than Blue Line, they had the right to "shop" the market for distribution services. Because of the tie, however,

---

22. It could be honestly said that Siwek and Nelson were stating that I had also made a similar mistake in my earlier Report and Recommendation when I suggested that impact could only be proven on a regional basis. For reasons stated in footnote 29 below, I believe I did make this mistake in my earlier Report.

Blue Line's anticompetitive conduct adversely impacted all class members by preventing franchisees from entering into lower-price contracts with third-party distributors and by undermining the credibility of threats to leave Blue Line. LCE's policies thus undercut the ability of all franchisees to negotiate better prices with Blue Line. Moreover, the ability of some franchisees to negotiate better prices with Blue Line would have led to lower prices for other franchisees. For all of these reasons, Blue Line's exclusionary behavior adversely impacted all franchisees by reducing competitive pressures for system-wide price reductions.

The earlier declaration includes an appendix showing that each Blue Line Distributor had at least one nearby independent distributor that could have created a potential competitive threat.

Plaintiffs' experts also indicate in their supplemental declaration that discovery of the Deal to Ilitch April 20, 1992, memo shows:

(1) that Blue Line planned on reacting to potential competition from AmeriServ by reducing prices throughout the nation and (2) that the threat of AmeriServ's serving Little Caesar's franchisees (even before it actually served any of their franchisees, or had established its relative efficiencies) led Blue Line to seriously consider cutting its prices. The memorandum also suggests that because of its anticompetitive conduct, Blue Line was maintaining supra competitive pricing.

They also note that other national class cases, such as *R & D Business Systems v. Xerox*, 150 F.R.D. 87 (E.D.Tex.1993), certified a national class even though the defendant Xerox "faced different service competitors in different parts of the country."[23] Thus, they argue that regional differences might have an effect relating to actual damages but not to antitrust "impact" within the meaning of the standards for class certification.

Plaintiffs' experts also point out that while Blue Line asserts that it can purchase at better costs than other national distributors, this is a disputed issue of fact in which plaintiffs' experts assert that Blue Line is "much smaller and thus less efficient than large systems distributors," it is doubtful it could compete on the merits for franchisee business but for its anticompetitive practices (see, e.g. paragraphs 43 and 45, Siwek and Nelson's earlier declaration) (Supplemental Declaration at ¶ 10).

With regard to the issue whether the scope of the tying arrangement involved only logoed products or also affected other items, plaintiffs' experts assert:

The defendants in their brief also argue that the scope of the products tied by the defendants' tying arrangement is an individualized issue. That argument ignores Blue Line's own documents which show that it analyzes its pricing on a market basket basis. (See, e.g. Appendix 6 to our prior declaration.) It also ignores the structural characteristics of the food distribution industry serving large chain accounts which do operate on highly structured cost-plus market basket pricing programs. In this type of environment, franchisees could not practically or economically make sustained purchases other than on a market basket program. Even if the tie is only of logo products, which is the most profitable portion of the market basket of goods, the franchisees are damaged across the entire line of products. This competitive effect is common to the class, given the way this industry operates.

*Id.* at ¶ 11.

Plaintiffs in their briefs also state that "defendants have admitted in a prior brief that the 'scope of the exclusive license is a common issue.'" Defendants' Third Supplemental Brief Opposing Class Certification at p. 2. Accordingly, plaintiffs argue that the *effect* of tying logoed goods is also a common issue. Finally, while plaintiffs argue that there is more than adequate common evidence to show the jury the scope of the tie, they also note that "the determination of the scope of the tie is unquestionably a merits

---

**23.** *See also, Collins v. International Dairy Queen,* *Inc.,* 168 F.R.D. 668 (M.D.Ga.1996).

issue relevant to damages which has no bearing on a class certification motion."

Plaintiffs, at n. 9 of their brief, assert that in reaching my earlier determination I overlooked the assertion of William Burgess in his declaration and deposition that indicated AmeriServ was willing to distribute throughout the Continental United States. Plaintiffs' Exh. 2, Burgess Declaration Exh. 1, and Plaintiffs' Exh. 13, Burgess Deposition at p. 91. Whether this assertion is true or not, plaintiffs' experts and other common evidence do suggest of some economic impact throughout the country, even though the exact measure may need to be proven region by region and depend upon the realistic availability of a viable alternate distributor to Blue Line.

Other cases have also been certified for national class treatment even though they involved regional variances and damages. *Image Technical Services, Inc. v. Eastman Kodak Co.*, 1994 WL 508735 (N.D.Calf.1994); *R & D Business Systems v. Xerox Corp.*, 150 F.R.D. 87 (E.D.Tex.1993) (Lockridge Decl. Ex. 5); *Martino v. McDonald's System, Inc.*, 81 F.R.D. 81 (N.D.Ill.1979); *Krehl v. Baskin–Robbins Ice Cream Co.*, 78 F.R.D. 108 (C.D.Cal.1978); *Collins v. International Dairy Queen, Inc.*, 168 F.R.D. 668 (M.D.Ga. 1996).

## IV. Analysis on Predominance of Common Facts:

■ The commonality of proofs of a tie-in is an easy issue where there is an express contractual tie or an announced tie-in. The inability to prove a tie-in by the express or direct application of the contract or by a defendant's announcement will make the proofs far more complicated. This will often, if not generally, require use of individual proof of coercion, particularly where salesmanship, refusals, pressure, or subtle threats are involved. Yet, in evaluating whether

common questions of law or fact predominate, the critical question under Rule 23(b)(3) is not whether the proofs are external to the contract terms,[24] nor whether they are complex instead of simple proofs. Rather, the critical question for Rule 23(b)(3) is whether the method of proving coercion involves facts—even if complex and external to the contract—that are predominately common to the class and not individual.

■ Judge Gadola notes that after *Jefferson Parish*, "the important inquiry centers on the buyer's state of mind and whether the buyer was forced or coerced into making the purchase of the tied product by the seller's conduct," 895 F.Supp. at 904.[25] Yet, this does not render irrelevant the nature of the seller's action and intent. Clearly, the case law and commentators are in accord that "forcing" and "coercion" mean something less than that the buyer would not have bought from the defendant but for the alleged illegal act. Even if the buyer would have bought from the defendant without the illegal act, an act is still an illegal tie if it created an impermissible added inducement to purchase defendant's product *B*, or impermissibly altered the market and competitive capabilities of alternate sellers to lessen or remove altogether the consumer's choice in choosing a competitor's product.[26]

In the present case, the buyer's state of mind of proposed class members knew there were no competitors offering logoed goods or other supplies needed to operate a franchise. The reasonable franchisee with the post–mid–1990 Franchise Agreement also knew (even Gary Smith reasonably must have known) that he had contractually given up the right to seek an alternate supplier of logoed goods. All of this was because of defendants' intended acts. This Court ultimately will determine if all of these acts as used in conjunction with the Blue Line exclu-

---

24. Again, in *Bogosian* there had to be proofs external to the contract to show its practical economic effect.

25. *See also, Bogosian* (Remand) opinion, 596 F.Supp. 62 (E.D.Pa.1984).

26. As noted by Areeda, Hovenkamp and Elhauge:

The best way to test whether buyers would otherwise have taken the defendant's tied product would be to offer the tying and tied products separately. If the best the defendant can say about an otherwise unlawful tie is that it has no effect, there is little reason to tolerate it.

(Footnote omitted.) Areeda, *supra* at 296.

sive license were legal competitive behaviors. If it determines that some were impermissible restraints on the market choice of consumers or on alternate potential distributors' ability to enter the market and compete with Blue Line, then—if this had an impact on prices franchisees paid for logoed products alone or for the entire market basket of goods needed to operate a franchise—an illegal tie-in is established even if the buyer did not know why only Blue Line distributed logoed goods or why potential alternate distributors felt inhibited or dissuaded from competing. Areeda, Hovenkamp and Elhauge make it clear that these post–mid–1990 franchisees would not need to ask for relief from the limitation their Franchise Agreement imposed on them in order to state a tie-in claim. Nor does it seem they would have to ask for an alternate distributor of other products and accept two-stop shopping—from Blue Line for logoed goods and the competitor distributor for other items—if the total market basket price remained higher than would be the case if competitors could offer all products including logoed goods.

If this Court determines that for the buyers in the new proposed class the *state of mind* element necessary to establish a tie-in need only encompass the knowledge that to be an LCE franchise one must buy logoed goods from Blue Line (because they are the sole distributor) and not ask for an alternate source, those elements can be proven by facts common to the class. Other facts concerning the actions of the defendants that

Areeda, Hovenkamp and Elhauge found relevant to ambiguous understood conditions can also be proven by facts common to the class.

Common proofs are also available on the use of a form franchise contract, high percentage (nearly 100%) of bundled sales, and "onerous terms" or supra-competitive prices for product "*B*" [logoed goods or all franchise foodstuffs and supplies] again relevant evidence in an ambiguous "understood condition" case.[27]

Finally, whether the actions of defendants impermissibly dissuaded potential alternate distributors from entering the market or from competing as effectively with Blue Line also will involve proofs in which common questions of fact will predominate based on plaintiffs' proposed method of proceeding.[28] Whether the scope of the tie-in involves solely *logoed goods or all products* is a question that presently seems to involve a predominance of common questions of law and fact.

■ While plaintiffs may ultimately fail to prove defendants' actions were illegal, or fail to prove any effect on prices, or fail to prove the tie-in of logoed products leveraged a larger tie-in, all of these are merit questions that should not affect the class certification question. Based on plaintiffs' present theories and proffer of proofs, I believe that common questions of law and fact predominate over individual questions on the liability issue of this tie-in claim, including the issue of impact as plaintiffs presently intend to prove impact.[29]

27. *See* Areeda, Hovenkamp and Elhauge, *supra*, § 1756, pp. 314–323.

28. The "one-stop" v. "two-stop" preference is not a critical issue if alternate competitors cannot compete without logoed goods as part of their mix. Also, the Court need not hear from every franchisee to determine whether offering "one-stop" shopping with a full line of products is a competitive advantage over offering only the non-logoed products. If it is a competitive advantage of some significance, as defendants seem to admit in their memoranda, and if it is obtained by an impermissible means, then an illegal tie-in could be established on this by predominately common proofs.

29. If one uses heuristically the Deal to Ilitch memo of April 20, 1992, to posit the hypothetical

assumption that plaintiffs could prove that Blue Line would lower its profit margin by "1.0 to 1.255 percentage points" in areas faced with a potential competitor and "about one-half that amount at other [Blue Line distribution] centers," then the issue of impact could be shown nationwide with common proofs. The analysis in my earlier Report and Recommendation at pp. 55–58, on the need for regional proofs, then would be applicable only to the *exact measure* of damages—i.e., does the class member get damages of 1 % of past purchases because there was an available alternate distributor in the region or only 1/2% of past sales as damages because there was *no* immediately available alternate distributor. In my earlier Report and Recommendation, I discounted plaintiffs' asserted common proofs of impact and confused them with the types of proofs needed to prove actual damages. Such fact-finding is inappropriate in a determination

With regard to superiority of class treatment, if for purposes of class treatment we assume that plaintiffs' allegations are correct, then all class members are victims of the defendants' illegal tying arrangement. Until it has been determined as to the size of damages resulting from this illegal tie, it is hard to determine whether the levels of damages for each individual franchisee are sufficient to support and warrant an individual cause of action. Given the uncertainty of this, as well as the monumental task of taking on a complex and enormous litigation of a franchise antitrust claim, when added to the fact that each franchisee may also be reluctant to commence an individual action against the franchisor upon whom they are so dependent, it seems that a class action is a superior method, and that no alternative method of resolving this dispute would be as fair and efficient.

Clearly, this case can be bifurcated so that issues of liability are tried separately from those of damages. The Court can then consider whether to modify or whether to treat the damage claims as a class action, or use a Special Master or other device for calculation of damages. Notwithstanding defendants' arguments on complexity of damages, these issues need not be addressed in detail at this time. While defendants dispute its continued vitality, there is substantial case authority holding that the need to compute individual damages will not prevent class certification on issues of liability.[30] If some mechanical method of computing individual damages,

such as using some differential in profit margins charged multiplied by gross purchases by each individual franchisee, or some other common economic theory for measuring damages is not derived with possible use of subclasses, this Court could choose not to pursue the damages phase on a class basis.[31]

As noted by *Newberg on Class Actions*, § 4.26 at p. 4–90 to 4–93 (3d ed. 1992):

In most cases, the amount of damages suffered is an individual matter, but the Advisory Committee Notes expressly state that such needed individual proof of damages will not preclude a finding of predominance. Courts have substantially reduced the judicial burdens of resolving individual damage issues through various devices such as bifurcated trials of liability and damages issues with same or different juries; use of master or magistrates to preside over individual damages proceedings; class decertification after liability trial accompanied by notice to the class....

Thus, the potential difficulties involving damages in this case are not insurmountable and should not preclude class treatment over alternate means of litigating this dispute of national significance.

Accordingly, for the above-stated reasons, I recommend that the Court certify the proposed Rule 23(b)(3) damages class and allow the Smith plaintiffs to serve as class repre-

---

on class certification, and in this Report and Recommendation I do not wish to repeat this error.

**30.** As noted by the Sixth Circuit in *Sterling v. Velsicol Chemical Corp.*, 855 F.2d 1188, 1197 (6th Cir.1988):

No matter how individualized the issue of damages may be, these issues may be reserved for individual treatment with the question of liability tried as a class action. Consequently, the mere fact that questions peculiar to each individual member of the class remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible.

I am also familiar with *In re Consumers Power Securities Litigation*, 105 F.R.D. 583 (E.D.Mich. 1985). In that case the damages issues involved sales on multiple dates at different prices of

Consumers' various securities, which prices were allegedly inflated due to varying degrees of non-disclosure about the problems that Consumers Power was having with the development of its nuclear power facility at Midland, Michigan. The difference money calculations for each sale of security based upon an imputed actual fair market value had disclosures been made involved damages calculations of complexities at least equal to those in this case, if not far more complex.

**31.** Plaintiffs' experts Siwek and Nelson have proposed various formulaic methods to compute damages. Even if this Court does not select a formulaic method to compute damages on a class-wide basis or by regions, it is not clear that a series of individual mini-trials would be necessary given the historical trend that many complex cases settle once the liability issues have been determined.

sentatives.[32]

## V. Class Certification on Tying Claim Injunction/Declaratory Judgment Relief.

Plaintiffs seek class certification not only for their damages claims on the mid–1990 Franchise Agreement, but they also seek declaratory and injunctive relief for the same class under Rule 23(b)(2).[33] In addition to the Rule 23(a) requirements of numerosity, common questions, typicality, and fair and adequate representation, Rule 23(b)(2) requires the plaintiffs to show that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Because I have recommended that the tying claim be certified for class treatment on damages, it should be similarly treated with respect to declaratory and any injunctive relief this Court may deem appropriate if it determines that there has been a tie-in violation.

In the present case, if proven, the defendants acted on "grounds generally applicable" to all post–mid–1990 franchisees thereby satisfying Rule 23(b)(2). *See Senter v. General Motors Corp.*, 532 F.2d 511 (6th Cir.1976), *cert. denied*, 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150 (1976); *Weathers v. Peters Realty Corp.*, 499 F.2d 1197 (6th Cir. 1974). The Court should consider certifying a declaratory and injunctive class even if it determines the case should not be certified under Rule 23(b)(3) for the damages claim.

Newberg, Wright, Miller and Kane, and the official Committee notes to Rule 23(b)(2) all conclude that the defendants' allegedly wrongful conduct need not be directed at or damaging to every member of the class for a Rule 23(b)(2) class action. 1 H. Newberg, *Newberg on Class Actions*, § 4.11 (3d ed. 1992); 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure*, § 1775 at pp. 455–56 (2d ed.

1986); 1966 Committee notes to Rule 23(b)(2).

The 1966 Committee Notes use as an example of an appropriate injunctive class a challenge to the legality of an alleged tying arrangement:

> So also a patentee of a machine, charged with selling or licensing the machine on condition that purchasers or licensees also purchase or obtain licenses to use an ancillary unpatented machine, could be sued on a class basis by a numerous group of competing sellers or licensors of the unpatented machine, to test the legality of the "tying" condition.

Rule 23(b)(2) requires a showing that the party opposing the class acted on grounds generally applicable to the class. Unlike Rule 23(b)(3), it does not require the Court to determine the predominance of common questions of law and fact or the superiority of class action treatment of adjudication.

Thus, I recommend this Court certify the proposed Rule 23(b)(3) declaratory and injunctive class and allow the Smith plaintiffs to serve as class representatives.[34]

### RECOMMENDATION

IT IS RECOMMENDED that this Court certify the proposed damages and declaratory and injunctive class and allow the Smith plaintiffs to serve as class representatives.

As with my earlier Report, because of the length of this Report and Recommendation and the complexity of the issue, the parties should have twenty (20) business days from the service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Because service is by mail, this deadline date for objecting shall be November 4, 1996. *See* Fed.R.Civ.P. 6(e). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947 (6th Cir.1981). Filing

---

32. *See* footnote 3 above and surrounding text.

33. The Court may determine that injunctive relief is not necessary in light of the fact that defendants recently have approved alternate distribu-

tors and have given them access to logoed products.

34. *See* footnote 3 above and surrounding text.

of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir.1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge. (The service copy need not include exhibits submitted on this or the earlier class certification motion.)

Within ten (10) business days of service of any objecting party's timely filed objections, the opposing party may file a response. It should also be served on the Magistrate Judge without exhibits earlier submitted.

Objections and responses shall be not more than thirty-five (35) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: September 30, 1996.